IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

TOLL ROAD INVESTORS
PARTNERSHIP II, L.P.,
      Plaintiff,

v.                              Civil No. 3:25cv135 (DJN)

THE COMMONWEALTH OF
VIRGINIA, *et al*,
      Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on Defendants the Commonwealth of Virginia

("Virginia"), the State Corporation Commission of Virginia ("the Commission"), and

Commissioners Jehmal T. Hudson, Samuel T. Towell and Kelsey A. Bagot's ("the

Commissioners," and collectively, "Defendants") Motion to Dismiss Plaintiff Toll Road

Investors Partnership II, L.P.'s ("Plaintiff") Amended Complaint. (ECF No. 35 ("Motion to

Dismiss").) For the reasons set forth below, the Court will GRANT Defendants' Motion to

Dismiss (ECF No. 35)[1] and DISMISS the Amended Complaint.

## I.     BACKGROUND

### A.    Factual Background

At this stage of the litigation, the Court must accept as true the facts set forth in the

Amended Complaint (ECF No. 33 ("Am. Compl.").) *Ashcroft v. Iqbal*, 556 U.S. 662, 678

---

[1]    Plaintiff filed a motion requesting oral argument on Defendants' Motion to Dismiss.
(ECF No. 38.) Because the parties' papers provide a sufficient basis upon which to rule and oral
argument will not materially aid the Court's decision process, the Court will DENY that motion
(ECF No. 38).

(2009).  Accordingly, the Court accepts the following facts as alleged for purposes of resolving the Motion to Dismiss.

Plaintiff, a private entity, owns and operates the Dulles Greenway (the "Greenway"), a private toll road in Loudoun County, Virginia, which first opened in 1995.  (Am. Compl. ¶¶ 1, 29.)  The Greenway was built on privately owned property using private funds.  (*Id.* ¶¶ 22–32.)  Plaintiff is subject to regulation by the Commission under the Virginia Highway Corporation Act of 1988 ("VHCA"), Va. Code §§ 56-535, *et seq.*  (*Id.* ¶¶ 5, 36.)  Plaintiff may set or change its toll rates only with Commission approval.  (*Id.* ¶¶ 38, 90); Va. Code § 56-542(D).  To obtain approval for a toll rate increase, Plaintiff must propose tolls that (1) are set at a level "reasonable to the user in relation to the benefit obtained," (2) are not likely to "materially discourage use of the roadway," and (3) "provide the operator no more than a reasonable return as determined by the Commission."  (Am. Compl. ¶¶ 39, 79); *see* Va. Code § 56-542(D).  The Greenway is currently the only road subject to the VHCA's requirements.  (Am. Compl. ¶¶ 5, 42.)  All other private toll roads in Virginia are governed by the later-enacted Public-Private Transportation Act of 1995 (PPTA).  (*Id.* ¶ 42.)

Plaintiff began experiencing financial woes almost immediately after the Greenway's opening, with ridership falling far short of projections.  (*Id.* ¶¶ 45, 47.)  Just three years after opening, Plaintiff entered default on some of its debts, forcing it to refinance its debt.  (*Id.* ¶¶ 47, 50.)  The Court refers the reader to the Supreme Court of Virginia's opinion in *Toll Rd. Invs. P'ship II L.P. v. State Corp. Comm'n*, 918 S.E.2d 33 (Va. 2025) ("Va. S. Ct. Opinion*)* for a full discussion of Plaintiff's financial challenges during this time.  *Id.* at 35–36.

Plaintiff alleges that, by the 2010s, it had become a political target in Virginia.  (Oppo. at 10.)  Among other claims, unnamed Loudoun County politicians condemned Plaintiff's

"foreign" ownership and accused it of engaging in "highway robbery." (Am. Compl. ¶ 70.) In 2012, Loudoun County and a member of the House of Delegates from that county instigated an investigation of Plaintiff by the Commission, arguing for a reduction in Plaintiff's approved toll rates. (*Id.* ¶ 72.) Plaintiff's toll rates ultimately remained unchanged. (*Id.*)

In 2021, the General Assembly amended the VHCA. (*Id.* ¶¶ 75-90); 2021 Va. Acts Ch. 349 (the "VHCA Amendments"). Among other changes, the amended law eliminated annual toll adjustments based on inflation. (*Id.* ¶ 76.) The VHCA Amendments also no longer permit the Commission from approving more than one year of toll rate increases at a time, even though the Commission typically requires more than one year to review applications. (*Id.* ¶ 77.) The amendments also redefine the "material discouragement" standard, prohibiting any rate increase that would have more than a three-percent effect on ridership. (*Id.* ¶¶ 81–83); Va. Code § 56-542(A).

Plaintiff alleges that unnamed "supporters" of the VHCA Amendments "admit" that these amendments constitute a threat to the Greenway's survival. (*Id.* ¶ 74.) These "supporters" similarly "admit" that the VHCA Amendments were intended to ensure that Loudoun County would enjoy greater leverage in future negotiations regarding Plaintiff's potential demise. (*Id.*) Another unnamed politician stated to the press that "[w]ith the new law in place" the "threat to the survival of the Greenway grows with each passing month." (*Id.* ¶ 9.)

In 2023, Plaintiff made its first application for a toll increase under the amended VHCA. (*Id.* ¶ 91.) The Commission interpreted the new "material discouragement" standard to prohibit any increase in tolls that would diminish traffic growth on the Greenway by three or more percentage points, even if overall traffic numbers were still projected to increase. (*Id.* ¶ 83.) The Commission ultimately denied the application, finding that it did not meet the VHCA's new

criteria. (*Id.* ¶ 97); *Application of Toll Rd. Investors P'ship II, L.P.*, No. PUR-2023-00089, 2024 WL 4109445 (Va. S.C.C. Sept. 4, 2024) ("Final Order"). The Commission also rejected Plaintiff's argument that denial of its proposed toll increases would violate the United States and Virginia Constitutions' Takings Clauses by denying Plaintiff the ability to earn a reasonable rate of return. (*Id.* ¶ 98); Final Order at 6–7.

In the wake of the Commission's denial of Plaintiff's application, the chief sponsor of the VHCA Amendments declared that their passage had "delivered real results" and asserted that the Amendments were passed "to prevent these types of increases." (Am. Compl. ¶ 9.)

### B.    Procedural History

Plaintiff appealed the Commission's denial of its rate application to the Supreme Court of Virginia, submitting its opening brief on February 21, 2025. (ECF No. 20-2.) In its appeal, Plaintiff argued that the requested rate increase satisfied the statutory standard and that the VHCA Amendments and the Commission's order constituted regulatory takings under both the United States Constitution and the Virginia Constitution. Va. S. Ct. Opinion at 41.

That same day, Plaintiff filed this suit challenging the VHCA Amendments and the Commission's Order (the "Final Order"). (ECF No. 1.) Plaintiff challenged the constitutionality of the statute as amended and the Final Order under both the federal Takings Clause and the Virginia Constitution's equivalent. (*Id.* ¶¶ 89–138.) In addition, Plaintiff challenged the VHCA and the Final Order under both constitutions' Bill of Attainder Clauses. (*Id.* ¶¶ 139–84.) This Court subsequently granted Defendants' unopposed motion to stay this matter pending resolution of the appeal. (ECF No. 25.)

On July 17, 2025, the Virginia Supreme Court affirmed the Final Order, concluding that, on the record before it, the Commission permissibly rejected Plaintiff's proposed tolls and its

4

takings arguments.  (Am. Compl. ¶ 98;) Va. S. Ct. Opinion at 35.  On August 5, 2025, this Court lifted the stay, (ECF No. 30), and on August 25, 2025, Plaintiff filed its Amended Complaint, which constitutes the operative pleading in this case.  (ECF No. 33.)  The Amended Complaint alleges that the VHCA as amended violates the federal Takings Clause (Counts I and III), the Virginia Takings Clause (Count IV), and the federal Bill of Attainder Clause (Counts VI and VIII).  Plaintiff separately claims that the Final Order violates the federal Takings Clause (Counts II and III), the Virginia Takings Clause (Count V), and the federal Bill of Attainder Clause (Counts VII and VIII).[2]  Plaintiff seeks just compensation from the Commonwealth and the Commission; damages from the Commissioners in their personal capacities; and declaratory and injunctive relief against the Commonwealth, the Commission and the Commissioners in their official capacities.  (*Id.* at 33–34.[3])

Defendants filed the instant Motion to Dismiss on September 25, 2025.  (ECF No. 35.) Defendants assert that this Court lacks jurisdiction over all aspects of this case under the Johnson Act, codified at 28 U.S.C. § 1342.  (ECF No. 36 ("Memorandum in Support" or "Mem.") at 14– 17.)  Defendants further assert that Eleventh Amendment Sovereign Immunity bars an exercise of federal jurisdiction over the majority of Plaintiff's claims.  (*Id.* at 17–20.)  Defendants also argue that Plaintiff's claims stand barred by the doctrines of claim and issue preclusion, in light of the Supreme Court of Virginia's opinion disposing of Plaintiff's similar arguments on appeal. (*Id.* at 23–25.)  As to the merits, Defendants assert that the Amended Complaint fails to state a claim for relief under either constitutional theory.  (*Id.* at 25–36.)  Finally, Defendants claim that

---

[2]     Counts III and VIII appear in both groupings, because each count asserts a § 1983 claim against the Commissioners predicated on both the VHCA as amended and the Final Order.

[3]     The Court employs the pagination assigned to court filings by the CM/ECF docketing system.

the Commissioners are shielded from suit in their personal capacities under the doctrine of qualified immunity. (*Id.* at 36–39.)

Plaintiff timely opposed Defendants' Motion to Dismiss (ECF No. 37 ("Opposition" or "Oppo.")), and Defendants timely replied (ECF No. 41 ("Reply")), rendering the Motion to Dismiss ripe for resolution.

## II.    LEGAL STANDARD

Defendants move for dismissal of the Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). A motion made pursuant to Rule 12(b)(1) challenges a court's jurisdiction over the subject matter of the complaint. A defendant moving for dismissal for lack of subject matter jurisdiction may either attack the complaint on its face, asserting that the complaint "fails to allege facts upon which subject matter jurisdiction can be based," or may attack "the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *White v. CMA Const. Co., Inc.*, 947 F. Supp. 231, 233 (E.D. Va. 1996). "Under this latter approach, '[n]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.'" *Percival Partners Ltd. v. Nduom,* 2023 WL 2088421, at *3 (E.D. Va. Feb. 17, 2023) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)), *aff'd*, 99 F.4th 696 (4th Cir. 2024). In either case, the plaintiff bears the burden of proof to establish jurisdiction. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). The Court must dismiss an action if it determines that it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3).

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint; it does not serve as the means by which a court will resolve factual contests, determine the merits of a

6

claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court accepts the well-pleaded allegations in the complaint as true and views the facts in the light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Under Federal Rule of Civil Procedure 8(a), a complaint must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* Ultimately, "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557. The facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003).

### III.   ANALYSIS

Plaintiff raises eight counts in its Amended Complaint, alleging the following violations of law:  violations of the Takings Clause of the United States Constitution (Counts I, II and III); violations of the Takings Clause of the Virginia Constitution (Counts IV and V); and violations of the Bill of Attainder Clause of the United States Constitution (Counts VI, VII and VIII).  (Am. Compl. ¶¶ 104–85.)  In each instance, Plaintiff challenges the constitutionality of both the 2021

VHCA Amendments and the Commission's Final Order. Counts III and VIII additionally seek damages under 42 U.S.C. § 1983 against the Commissioners in their personal capacities. Defendants move to dismiss all eight counts on a variety of grounds, including lack of jurisdiction under the Johnson Act and the Eleventh Amendment, claim and issue preclusion, failure to state a claim, and qualified immunity. (Mem. at 14–39.) Because federal courts must generally confirm their jurisdiction before addressing the merits of any arguments raised, the Court first considers these threshold issues before addressing the merits of Plaintiffs' remaining claims. *Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180, 187 (4th Cir. 2019).

### A.    Non-Justiciability under the Johnson Act

Defendants first assert that the Court lacks jurisdiction to adjudicate Plaintiff's Amended Complaint pursuant to the Johnson Act (the "Act"). (Mem. at 14.) Codified at 28 U.S.C. § 1342, the Johnson Act withdraws state utility rate cases from the jurisdiction of federal district courts when certain conditions are met. The Act provides as follows:

> The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:
>
> (1)    Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,
> (2)    The order does not interfere with interstate commerce; and,
> (3)    The order has been made after reasonable notice and hearing; and,
> (4)    A plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1342. The Johnson Act strips federal district courts of jurisdiction over utility rate matters only when all four of its conditions are met. *Williams v. Pro. Transp. Inc.*, 294 F.3d 607, 612 (4th Cir. 2002). The burden to establish the Act's applicability lies with the party invoking it. *Id.*

8

Courts have characterized the Johnson Act as demonstrating Congress's intent to force plaintiffs contesting state utility rate proceedings to "avail themselves of state remedies." *Peoples Nat. Util. Co. v. City of Houston*, 837 F.2d 1366, 1368 (5th Cir. 1988). In other words, the Act "was intended to keep constitutional challenges to orders affecting rates out of the federal courts 'lock, stock and barrel,'" and to "effect a general hands-off policy relative to state rate making." *Tennyson v. Gas Serv. Co.*, 506 F.2d 1135, 1138 (10th Cir. 1974) (internal citations omitted); *see also Miller v. NYS Pub. Serv. Comm'n*, 807 F.2d 28, 32–33 (2d Cir. 1986) (providing an extended discussion of the Act's legislative history, which "makes clear that the aim of Congress was to remove completely the subject of utility rates from the federal courts.") As the Fifth Circuit has emphasized, "Plaintiffs may not use § 1983 as an 'end run' around the Johnson Act." *Peoples Nat. Util. Co.*, 837 F.2d at 1368.

Since Plaintiff seeks different forms of relief from different parties under different theories, the Court considers first whether the Johnson Act stands generally applicable to the various claims, and to what degree. For any claims that fall within the Johnson Act's general ambit, the Court then proceeds to analyze whether these claims also satisfy the Act's substantive requirements. The Court considers Plaintiff's claims in two groups: challenges to the Commission's Final Order (Counts II, III (in part), V, VII and VIII (in part)), and challenges to the VHCA itself (Counts I, III (in part), IV, VI, and VIII (in part)).

For the reasons set forth below, the Court finds that Plaintiff's challenges to the constitutionality of the Final Order and its enforcement fall within the Johnson Act's general ambit, while Plaintiff's facial challenges to the VHCA do not. The Court further finds that these challenges to the Final Order and its enforcement also satisfy the Act's substantive requirements, mandating their dismissal for lack of jurisdiction.

9

### 1.    General Ambit Analysis as to All Counts

The Court turns first to Counts II, III, V, VII and VIII[4] of the Amended Complaint, which challenge the Commission's Final Order and its enforcement, and which seek a mix of declaratory and compensatory relief. Plaintiff provides no opposition to, and thus concedes, Defendants' argument that the Final Order falls within the Johnson Act's definition of an "order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision." 28 U.S.C. § 1342; (Mem. at 5–8). However, Plaintiff argues that the Johnson Act does not bar Plaintiff's challenges to the Final Order, because Plaintiff seeks only declaratory and monetary relief[5] under the relevant counts, not injunctive relief. In support, it cites the Act's exclusive emphasis on "enjoining, suspending or restraining" rate orders, (Oppo. at 14), and quotes Fourth Circuit case law that limits the Act's scope to only "the circumstances in which a federal court could *issue injunctions* against" such orders. (*Id.* (quoting *Aluminum Co. of Am. v. Utilities Comm'n of N.C.*, 713 F.2d 1024, 1027 (4th Cir. 1983)) (emphasis in original). Defendants oppose this argument, citing case law from several federal courts of appeals that recognizes a broader sweep for the Johnson Act, including for "non-injunctive relief that would act against a rate order." (Reply at 10–11.)

---

[4]    Counts III and VIII seek damages from the Commissioners in their personal capacity and stand premised on the Commissioners' "authority to enforce the challenged statutory scheme and the confiscatory rates resulting from the Commission's Final Order." (Am Compl. ¶¶ 131, 181.) The Court reads Plaintiff's claims under these two counts to challenge the enforcement of both the VHCA (as facially unconstitutional) and the Commission's Final Order (as an unconstitutional application of the VHCA). Accordingly, the Court considers these counts under both parts of its Johnson Act analysis.

[5]    While Plaintiff's argument focuses primarily on what it asserts to be the Act's inapplicability to monetary relief and does not expressly address declaratory relief, the Court reads Plaintiff's statement that the Johnson Act "cannot deprive the Court of jurisdiction . . . for anything other than injunctive relief" to assert that Plaintiff's claims for declaratory relief similarly fall outside of the Act's ambit. (Oppo. at 14.)

The Court agrees with Defendants and finds that the Johnson Act's general ambit encompasses Plaintiff's claims concerning the Commission's Final Order. The weight of the case law interpreting the Act on this point, along with the Act's text and purpose, strongly support such a result.

The Tenth Circuit addressed this very issue in its landmark opinion concerning the Johnson Act, *Tennyson v. Gas Service Company*, 506 F.2d 1135 (10th Cir. 1974). In considering what it termed "the Congressional hands-off policy relating to rate making," the court found that a construction of the Johnson Act's jurisdiction-stripping provision that applied only to injunctive relief claims would run contrary to that Congressional intent. *Id.* at 1139. It based this conclusion on the fact that any decision addressing the merits of declaratory or monetary relief claims "would of necessity involve our decision as to the same issues proscribed by the Johnson Act," and that any such alternative relief "would impinge upon duly filed rate schedules and thus would effect indirectly that which the Johnson Act precludes." *Id.* On that basis, the Tenth Circuit found that the Johnson Act applied to the plaintiff's complaint as a whole, highlighting "that what is here being attempted is precisely what the Johnson Act in part sought to avoid, namely, the pitting of federal court against state court in the rate making process." *Id.* at 1143.

The Tenth Circuit found support for its conclusion in *Great Lakes Dredge & Dock Company v. Huffman*, a 1943 Supreme Court decision addressing a statutory provision that included the same "enjoin, suspend or restrain" language as the Johnson Act.[6] 319 U.S. 293

---

[6]    *See* 28 U.S.C. § 1341 ("The district courts shall not *enjoin, suspend or restrain* the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.") (emphasis added); *Tennyson*, 506 F.2d at 1139 n.8 (discussing similarities between § 1341 and § 1342 and highlighting, "[a]s noted by Mr. Justice Frankfurter, [that] rate orders and taxation were 'two fields where the greatest

11

(1943). There, the Court considered whether that statute's jurisdiction-stripping provision applied with equal force to actions seeking declaratory relief, providing the following reasoning in support of such an approach:

> It is true that the Act of Congress speaks only of suits "to enjoin, suspend, or restrain" . . . and that the declaratory judgment procedure may be, and in this case was, used only to procure a determination of the rights of the parties, without an injunction or other coercive relief. It is also true that that procedure may in every practical sense operate to suspend collection of the state taxes until the litigation is ended.

*Id.* at 299. While the Supreme Court ultimately found it unnecessary to determine whether the statutory language extended to other forms of relief, its reasoning remains persuasive in highlighting the practical effect of permitting non-injunctive actions against state rate orders. As Plaintiff seeks here, such actions establish a workaround that "in every practical sense" would violate the Johnson Act's objective as much as an action seeking only injunctive relief. *Id.*

Other courts have likewise concluded that the Johnson Act reaches claims against rate orders regardless of the relief sought. For example, in *Klotz v. Consolidated Edison Company of New York*, the district court found that the Johnson Act "bar[s] declaratory relief as well as injunctive relief," finding that "it would be disingenuous to deny that declarations of claimed rights such as the ones sought by plaintiff in this case, would have any other result than the enjoining, suspension or restraint of the collection of the tax or the operation of the rate order." 386 F. Supp. 577, 585 (S.D.N.Y. 1974). The Second Circuit reaffirmed such a reading of the Johnson Act in *Miller v. New York State Public Service Commission*, holding that the Johnson Act's elimination of federal court jurisdiction over state rate cases "must read to reach broadly over all jurisdiction in rate cases, including the awarding of monetary damages." 807 F.2d at 33.

---

dissatisfaction with federal jurisdiction existed.'") (quoting *Alabama Pub. Serv. Comm'n v. Southern Ry.*, 341 U.S. 341, 358–59 (1951) (Frankfurter, J., concurring in result)).

12

Applying a similar functionalist lens as the Tenth Circuit in *Tennyson* and the Supreme Court in *Great Lakes*, the court emphasized that "a narrower reading of the statute to cover only injunctive relief would render the statute a nullity, allowing [challengers] to use [other types of claims and other doctrines] to restrain the imposition of rates just as effectively as an action for injunctive relief." *Id.* The Second Circuit based this reading on its expansive study of the Act's legislative history, which revealed that "the aim of Congress was to remove completely the subject of utility rates from the federal courts," not just for injunctive actions. *Id.* at 32–33.

Turning to the instant case, the Court finds no reason to diverge from the sound logic of its sister courts. The gravamen of Plaintiff's claims concerns its frustration with the Commission's Final Order rejecting its application for higher toll rates; above all else, Plaintiff seeks to have this Court reverse that Order. Permitting Plaintiff to challenge that Order in federal court plainly contravenes Congress's well-documented intent to "keep constitutional challenges to orders affecting rates out of the federal courts 'lock, stock and barrel.'" *Tennyson*, 506 F.2d at 1138. Plaintiff's attempt to avoid the Johnson Act's reach by artfully pleading claims for only declaratory and financial relief, but not injunctive relief, fails to change that fact. Much like its sister courts around the country, this Court will not countenance such an end run around Congressional intent and foundational principles of federalism.

For these reasons, the Court finds that Plaintiff's challenges to the Commission's Final Order — Counts II, V and VII in their entirety, and Counts III and VIII in part — fall within the Johnson Act's general ambit, warranting further analysis of whether these claims satisfy the Act's substantive requirements.

The Court arrives at a different outcome as to Plaintiff's facial challenges to the VHCA and its enforcement more broadly (Counts I, IV and VI in full, and Counts III and VIII in part).

13

Defendants assert that these challenges functionally serve to enjoin operation of the Commission's Final Order and any future rate orders, thus running afoul of the Johnson Act's purpose, if not its text. (Mem. at 14–15.) Defendants' rationale has been endorsed by some courts[7] and, if adopted here, would foreclose federal jurisdiction over Plaintiff's Amended Complaint altogether.

The Court declines to adopt Defendants' expansive reading of the Johnson Act, for two primary reasons. First, looking to the statutory text, the Court notes the repeated and exclusive use of the word "order" as the object of the Act's restrictions. *See* 28 U.S.C. § 1342 (barring district courts from enjoining, suspending or restraining the operation of "any *order* affecting rates," so long as the "order" meets certain criteria) (emphasis added). The statutory text does not enumerate any other promulgations — such as regulations or statutes — that it seeks to shield from challenges in federal court. It also fails to contain any catch-all language that would support reading the Act to extend beyond mere "orders." The title of the statutory provision, "Rate Orders of State Agencies," similarly suggests a limited focus on rate orders, rather than the statutes or regulations that govern their issuance. By contrast, the statute's prohibition on attempts to "enjoin, suspend or restrain" such orders employs inherently expansive language that necessarily prohibits more than just injunctive relief, since a contrary reading would render the words "suspend or restrain" mere surplusage. *Id.* § 1342. Read alongside this broadly-worded

---

[7] *See, e.g., S.C. Elec. & Gas Co. v. Whitfield*, 329 F. Supp. 3d 191, 205 (D.S.C. 2018) (holding that the Johnson Act applies not just to challenges to rate orders, but also to constitutional challenges to statutes where a declaration of unconstitutionality would "necessarily nullify" a rate order); *see also Hanna Mining Co. v. Minnesota Power & Light Co.*, 573 F. Supp. 1395, 1401 (D. Minn. 1983) ("Federal courts may not impinge upon a rate order by taking any action that would affect it, even indirectly.").

14

provision, the statute's explicit emphasis on "order[s]" evinces intent to address challenges only to such promulgations, and not to facial challenges.

Second, the Court finds that the Supreme Court's opinion in *Public Utilities Commission of the State of California v. United States*, 355 U.S. 534 (1958) ("*PUC*") likely forecloses Defendants' argument. There, the United States challenged a California statute granting the power to regulate rates for common carriers transporting federal government property to the state's public utilities commission. *Id.* at 535–36. The Court held that the Johnson Act was not applicable to the federal government's suit, because "the challenge is not to a rate 'order' but to a statute which requires the United States to submit its negotiated rates . . . for approval." *Id.* at 540. In drawing that distinction, the Court explained that, in this case, "[t]he United States wants to be rid of the *system* that subjects its procurement services to that form of state supervision," not just an "order." *Id.* (emphasis added). Here, too, Plaintiff's facial challenges to the VHCA seek to challenge the *system* that Virginia created for approving or setting Plaintiff's tolls, not just a particular set of rates. While that system necessarily gave rise to a specific order, this Court, in following *PUC*'s reasoning, finds such a systemic challenge distinct in kind from Plaintiff's challenges to the Final Order itself, warranting different treatment under the Johnson Act.

In sum, given the Supreme Court's distinction between "orders" and "systems," and given the Johnson Act's repeated and exclusive references to the former (but not the latter), the Court declines Defendants' invitation to read the Johnson Act's jurisdiction-stripping language to reach a broader swath of challenges than Congress expressly set forth. *See Monongahela Power Co. v. Schriber*, 322 F. Supp. 2d 902, 914 (S.D. Ohio 2004) ("Because [the utility] challenges the statute, and not the [agency] orders per se, the Johnson Act does not divest this

Court of jurisdiction."); *Hill v. Kansas Gas Serv. Co.*, 323 F.3d 858, 863 (10th Cir. 2003) (explaining that the Johnson Act does not deprive a federal court of jurisdiction "unless a plaintiff's challenge is to an 'order affecting rates'") (citation omitted); *see also Midi v. Holder*, 566 F.3d 132, 136 (4th Cir. 2009) (holding that courts "must construe" jurisdiction-stripping statutes "narrowly, so as to avoid substantial constitutional concerns.")  Accordingly, the Court finds that the Johnson Act does not bar Plaintiff's challenges to the VHCA and its enforcement under Counts I, IV and VI in full, and Counts III and VIII in part.

### 2. Substantive Requirements Analysis as to Counts II, III, V, VII and VIII.

Having found that Counts II, V, VII and parts of Counts III and VIII challenging the constitutionality of the Commission's Final Order fall within the Johnson Act's general ambit, the Court proceeds to assess whether these claims meet the Act's four substantive requirements. As Defendants correctly point out, Plaintiff concedes that the first requirement (concerning the source of the Court's jurisdiction) and the third requirement (reasonableness of notice and hearing) are met. (Reply at 11 (citing Oppo. at 7–8).)  The Court thus focuses only on the two contested factors:  (a) whether the Commission's Final Order interferes with interstate commerce, 28 U.S.C. § 1342(2); and (b) whether someone challenging the order can obtain a "plain, speedy and efficient remedy" in Virginia's courts. *Id.* § 1342(4).

Defendants prevail on both required elements.  Turning first to whether the Final Order interferes with interstate commerce, the Court notes that neither the statute nor the case law provide a clear definition of what qualifies as "interference." *See Preston County Light & Power Co. v. Public Service Com.*, 297 F. Supp. 759, 763 (S.D. W. Va. 1969) (noting the absence of an established rule and holding that "[e]ach case must necessarily be dealt with on its own facts and circumstances").  As such, the Court turns to Merriam-Webster's definition of "interfere," which

16

reads, in relevant part: "to interpose in a way that hinders or impedes: come into collision or be in opposition." *Interference*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/interfere (last visited June 11, 2026). This definition's emphasis on "hinder[ing] or imped[ing]" interstate commerce, rather than merely affecting or impacting it, accords with how courts across the country have read the Johnson Act over time. *See, e.g., New York Cent. R. Co. v. Illinois Commerce Com.*, 77 F. Supp 520, 522 (N.D. Ill. 1948) (holding that a rate issued by a proper state body does not "interfere with interstate commerce" unless it is "directly burdensome or otherwise discriminatory of the interstate traffic"); *Louisiana Power & Light Co. v. Ackel*, 616 F. Supp. 445, 448 (M.D. La. 1985) (noting that "all state rate-making action does have some influence upon or effect upon interstate commerce," but finding that "these actions do not necessarily *interfere* with interstate commerce") (emphasis in original); *ACTS Ret.-Life Cmtys., Inc. v. Town of Columbus, N.C.*, 2012 WL 727033, at *5 (W.D.N.C. Mar. 6, 2012) ("The second condition, requiring that the order 'does not interfere with interstate commerce,' is also of doubtful meaning and limited importance. . . . Most attempts to argue that an order interferes with interstate commerce have been rejected.") (citation omitted).

Looking to the facts of this case, the Court finds that the Commission's Final Order did not "interfere with interstate commerce" for Johnson Act purposes. While Plaintiff's toll rates on the Greenway may well *affect* interstate commerce, given that a significant number of non-Virginia vehicles utilize the road, (Oppo. at 15), Plaintiff fails to show how the Final Order "hinders" or "impedes" these travelers, let alone interstate commerce more broadly. As the case law repeatedly emphasizes, mere "influence or effect" upon interstate commerce fails to rise to the level of "interference." *US West, Inc. v. Nelson*, 146 F.3d 718, 724 (9th Cir. 1998). If anything, the Commission's refusal to approve higher tolls *helps* interstate commerce, ensuring

17

that interstate drivers continue to enjoy an affordable option for travel through Northern Virginia. The Court therefore finds Defendants to have successfully established this element.

As to whether Plaintiff has a "plain, speedy and efficient remedy" in state court, the Court finds this element satisfied as well. "To be 'plain' the state remedy must not be uncertain or unclear. To be 'speedy' it must not entail significantly greater delay than a corresponding procedure in federal court. [And t]o be 'efficient' it must not require ineffectual activity or an unnecessary expenditure of time or energy." *Whitfield*, 329 F. Supp. 3d at 207 (quoting *Brooks v. Sulphur Springs Valley Elec. Co-op.*, 951 F.2d 1050, 1055 (9th Cir. 1991)). Various courts considering this question have found that the right to appeal a utilities commission order to a state court satisfies the Johnson Act's "plain, speedy and efficient remedy" requirement. *See, e.g., Diggs v. Pennsylvania Pub. Util. Comm'n*, 180 F.2d 623, 627 (3d Cir. 1950); *Zucker v. Bell Tel. Co. of Pennsylvania*, 373 F. Supp. 748, 755 (E.D. Pa. 1974), *aff'd*, 510 F.2d 971 (3d Cir. 1975); *New Jersey Suburban Water Co. v. Bd. of Pub. Util. Comm'rs*, 23 F. Supp. 752, 753 (D.N.J. 1938).

Here, Plaintiff's access to appellate review by the Supreme Court of Virginia constitutes a sufficient remedy for Johnson Act purposes. As demonstrated by the record in this case, Plaintiff was able to (and did) appeal the Commission's Final Order to that court as of right. *See* Va. Code § 12.1-39 (providing that "any party in interest, or any party aggrieved by any final . . . order[] or judgment of the Commission shall have, of right, an appeal to the Supreme Court irrespective of the amount involved"); Va. S. Ct. Opinion at 35 (discussing appeal). Further, Plaintiff could (and did) challenge the propriety of the Commission's Final Order as an unconstitutional taking, on which question it was entitled to (and received) *de novo* review. (ECF No. 20-2); Va. S. Ct. Opinion at 40; *see also City of Alexandria v. State Corp. Comm'n*,

18

818 S.E.2d 33, 40 (Va. 2018) (reaffirming that the Supreme Court of Virginia "will not hesitate to reverse" a Commission decision "if we find that it is based on a mistake of law"). The Supreme Court could (and did) engage in a thorough review of Plaintiff's claims, including its constitutional concerns. Va. S. Ct. Opinion at 40–43. And as Plaintiff concedes, the Court possessed the authority to remediate the Commission's Order by vacating or reversing it, had it found fault with the Commission's approach. (Oppo. at 16.) Plaintiff submitted its appeal on February 21, 2025, and the Virginia Supreme Court published its opinion less than five months later, on July 17, 2025 — a period that plainly does not "entail significantly greater delay" than if Plaintiff had first brought its claim in federal court. *S.C. Elec. & Gas Co.*, 329 F. Supp. at 207. Nor does the record otherwise suggest any inefficiency in the state court proceeding. This Court therefore joins many courts around the country in finding that such a mechanism permits direct review of a rate commission's order by a state court sufficient for Johnson Act purposes and rejects Plaintiff's claims to the contrary.

Plaintiff's attempt to bolster its argument by invoking *Driscoll v. Edison Light & Power Company*, 307 U.S. 104 (1939), a case addressing the Johnson Act's applicability to a significantly different Pennsylvania statutory regime, falls short. In *Driscoll*, a power company seeking to appeal a utility rate order encountered a state statute forbidding injunctive relief against a commission order by any state court "except in a proceeding questioning the jurisdiction of the commission." *Id.* at 109 (quoting Sec. 1111, P.L. 1053, Title 66, P.S.Pa. § 1441). The United States Supreme Court agreed with the commission's concession that no sufficient state court remedy existed for Johnson Act purposes, given the lack of any available relief in state court absent a jurisdictional dispute. *Id.* at 109–10. Here, no such limitation applies:  the Supreme Court of Virginia's review is plenary and imposes no threshold

19

limitation on the type of dispute that Plaintiff can raise in an appeal of a Commission Order. Va. Code § 12.1-39. *Driscoll* thus stands wholly inapposite to this case.

In sum, the Court finds that Plaintiff's instant challenge to the Commission's Final Order and its enforcement satisfies all of the Johnson Act's requirements. Plaintiff's action seeks to "enjoin, suspend or restrain the operation of . . . an[] order affecting rates by a public utility and made by a . . . rate-making body of a State political subdivision." 28 U.S.C. § 1342. Jurisdiction in this matter is based on "repugnance of the order to the Federal Constitution," and reasonable notice and hearing preceded entry of the Order. *Id.* § 1342(1), (3). Further, the Order does not "interfere" with interstate commerce, and Plaintiff had access to a "plain, speedy and efficient remedy" in the Supreme Court of Virginia. *Id.* § 1342(2), (4). Finally, and for the reasons already discussed, the Johnson Act's bar properly extends to all forms of relief sought by Plaintiff, not just to injunctive relief. As such, the Court will dismiss Counts II, V, and VII in their entirety, as well as Counts III and VIII to the extent that they concern the enforcement of the Commission's Order, for lack of jurisdiction.

## B.    Eleventh Amendment Sovereign Immunity

The Court proceeds to consider the extent to which state sovereign immunity under the Eleventh Amendment shields Defendants from Plaintiff's remaining claims in Counts I, III, IV, VI and VIII.

"Sovereign immunity is a sovereign's privilege not to be amenable to the suit of an individual without its consent." *Jackson Creek Marine, LLC v. Maryland*, 153 F.4th 423, 428 (4th Cir. 2025). State sovereign immunity in federal court stands governed by the Eleventh Amendment and its accompanying jurisprudence. The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity,

20

commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. Since states necessarily act through agents, state sovereign immunity extends to states' "agents and [] instrumentalities," *Regents of the Univ. of Cal. v. Doe,* 519 U.S. 425, 429 (1997), including state officials sued in their official capacities. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Because state defendants may waive sovereign immunity, courts in the Fourth Circuit treat this jurisdictional question "akin to an affirmative defense, meaning that the defendant bears the burden of demonstrating that sovereign immunity applies." *Zito v. N. Carolina Coastal Res. Comm'n*, 8 F.4th 281, 284 (4th Cir. 2021) (internal quotation marks omitted).

The United States Supreme Court has recognized six circumstances in which state sovereign immunity does not apply:

> (1) when a State consents to suit; (2) when a case is brought by the United States or another State; (3) when Congress abrogates sovereign immunity pursuant to Section 5 of the Fourteenth Amendment or pursuant to the Bankruptcy Clause; (4) when a suit is brought against an entity that is not an arm of the State; (5) when a private party sues a state official in his official capacity to prevent an ongoing violation of federal law; and (6) when an individual sues a state official in his individual capacity for ultra vires conduct.

*Id.* at 285. The fifth of these contexts refers to the exception announced in *Ex parte Young,* 209 U.S. 123 (1908), "which permits a federal court to issue prospective, injunctive relief against a state officer to prevent ongoing violations of federal law, on the rationale that such a suit is not a suit against the state for purposes of the Eleventh Amendment." *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010) (citing *Ex parte Young*, 209 U.S. at 159–60). Notably, the Fourth Circuit has repeatedly "declined to create an additional, blanket exception for [claims under] the Takings Clause," holding instead that the Eleventh Amendment bars plaintiffs from asserting such claims against states and their agents in federal court so long as "the State's courts remain

open to adjudicate such claims." *Zito*, 8 F.4th at 284 (citing *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 551 (4th Cir. 2014)).

Defendants assert that all but two of Plaintiff's claims stand barred by sovereign immunity.[8] In Defendants' telling, Plaintiff's claims against the Commonwealth, the Commission (as an instrumentality of the state), and the Commissioners acting in their official capacities (as state officials) are categorically shielded from suit in federal court unless one of three conditions is satisfied:  (1) Virginia waived its sovereign immunity; (2) immunity was abrogated under federal law; or (3) the *Ex parte Young* exception applies.  (Mem. at 18 (citing *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011)).)  Defendants contend that Virginia did not waive its sovereign immunity to federal takings claims in federal court,[9] (*id.* (citing *Booth v. State of Md.*, 112 F.3d 139, 146 (4th Cir. 1997)), and that Congress did not abrogate the states' sovereign immunity under the Declaratory Judgment Act or Section 1983. (*Id.* (citing *Quern v. Jordan*, 440 U.S. 332, 342 (1979), and *In re Sec'y of the Dep't of Crime Control & Pub. Safety*, 7 F.3d 1140, 1149 (4th Cir. 1993).)  Further, since Virginia courts are "open to adjudicate takings claims," any potentially abrogative effect of the federal Takings Clause is irrelevant here.  (*Id.* at 18–19.)  As to Plaintiff's claims under the Virginia Constitution, Defendants argue that any waiver by Virginia of its immunity to suit under its Constitution's

---

[8]    Under Defendants' reasoning, the only claims *not* shielded by sovereign immunity under the Eleventh Amendment are Plaintiff's claims for declaratory and injunctive relief against the Commissioners acting in their official capacity under its federal constitutional challenges (Counts I and VI).  (Mem. at 20.)

[9]    While Defendants do not dispute that Virginia waives its immunity to takings suits in its own courts, Defendants assert that this waiver does not extend to federal court.  (Reply at 15) (arguing that "a State's consent to suit in its own courts does not constitute an 'unequivocally expressed' intent to waive its immunity to suit in a federal court." (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984), and *Smith v. Reeves*, 178 U.S. 436, 448–4[9] (1900)).

22

Takings Clause in Virginia *state* court has no impact here, since Virginia did not expressly waive that immunity in *federal* court. (*Id.* at 19–20.) Finally, Defendants assert that, since Plaintiff's personal capacity claims against the Commissioners constitute a mere "pleading artifice" and should therefore be construed as claims against these officers in their official capacities, sovereign immunity blocks these damages claims as well. (*Id.* at 20–21.)

Plaintiff challenges several aspects of Defendants' argument. As to Plaintiff's federal law claims, Plaintiff disputes Defendants' assertion that Virginia courts stand "open to adjudicate" its federal takings claim. (Oppo. at 17.) Instead, Plaintiff asserts that it qualifies for the Fourth Circuit's exception to sovereign immunity for federal takings claims, given the limited degree of state court review available to Plaintiff under Virginia law.[10] (*Id.* at 17–18 (citing *Zito*, 8 F.4th at 288).) As to Plaintiff's takings claim under the Virginia Constitution (Count IV), Plaintiff argues that takings claims "do not implicate sovereign immunity" under Virginia law, and that therefore, any lack of waiver or abrogation of sovereign immunity for these claims is "irrelevant." (*Id.* at 18–19 (citing *Jackson Creek Marine, LLC v. Maryland*, 153 F.4th 423, 430–31 (4th Cir. 2025).) Finally, Plaintiff objects to Defendants' argument concerning its personal capacity claims against the Commissioners, asserting that these claims are properly pled and that state agents acting in their personal capacity are not entitled to sovereign immunity. (*Id.* at 19–21.)

The Court addresses each of Plaintiff's arguments in turn.

---

[10] Plaintiff also suggests that *Zito* and *Hutto* were wrongly decided. (Oppo. at 17 n.2.) However, as Plaintiff acknowledges, "*Zito* is the law in this Circuit," (*id.*); its holding thus binds the parties and this Court.

### 1.    Availability of State Court Relief

The Court turns first to Plaintiff's argument that the mechanisms available to challenge Defendants' alleged violation of the federal Takings Clause prove inadequate to satisfy the Fourth Circuit's requirement that state courts remain "open to adjudicate" such claims. *Zito*, 8 F.4th at 288.  To qualify as "open" under this standard, state courts must provide a "reasonable, certain, and adequate means" for plaintiffs to (1) challenge an action as a taking and (2) obtain compensation if the plaintiff prevails. *Id.*.

Plaintiff argues that the relevant mechanisms under Virginia law fail to satisfy these two requirements.  Because its only available means to challenge the Final Order was by way of an appeal to the Supreme Court of Virginia,[11] and because that Court's review was "confined to the Commission record, where [Plaintiff] could take no discovery and had no right to a jury trial on all issues of fact," Plaintiff claims that it was unable to adequately challenge the VHCA as a taking.  (Oppo. at 18.)  Further, Plaintiff points to the Commission's inability to afford just compensation to applicants before it and its inability to hear facial challenges to statutes, arguing that these factors demonstrate the lack of an adequate means for Virginia courts to adjudicate the takings claim that Plaintiff seeks to assert here.

Defendants oppose Plaintiff's arguments.  As to Plaintiff's ability to bring a takings challenge, Defendants note that "Virginia's highest court recently adjudicated this very claim" as proof that Virginia courts provided Plaintiff with an adequate forum for raising its takings

---

[11]    Article IX, Section 4 of the Virginia Constitution provides that "any party aggrieved by any final finding, order, or judgment of the Commission shall have, of right, an appeal to the Supreme Court." Article IX limits such challenges to this appellate mechanism, stating that "[n]o other court of the Commonwealth [aside from the Supreme Court of Virginia] shall have jurisdiction to review, reverse, correct, or annul any action of the Commission or to enjoin or restrain it in the performance of its official duties . . ." VA. CONST. ART. IX, § 4.

24

claims. (Reply at 14–15.) And as to whether Plaintiff could have obtained appropriate compensation if its challenge proved successful, Defendants attempt to sidestep this question by pointing out that, because the Supreme Court of Virginia rejected Plaintiff's challenge, "there was no occasion to determine compensation in this proceeding," and that this absence of a determination "does not mean that state courts could not adjudicate a claim for compensation in a meritorious case." (*Id.* at 15.)

Upon review of the parties' arguments and the relevant Virginia law provisions, the Court agrees with Defendants that Virginia's courts were "open to adjudicate" Plaintiff's takings claims for sovereign immunity purposes. Turning first to prong (1) of the analysis, the Court finds that Virginia courts plainly provided Plaintiff with a "reasonable, certain and adequate" method to challenge both the Commission's Final Order and the amended VHCA as a taking under federal law. *Zito*, 8 F.4th at 288. As Defendants rightly highlight, Plaintiff was able to (and did) directly appeal the Commission's Order to the Supreme Court of Virginia, which considered and adjudicated this claim under a *de novo* standard. (Reply at 14–15 (citing Va. S. Ct. Opinion at 41–43).) While Plaintiff maintains that it was not permitted to take discovery and did not receive a jury trial, Plaintiff fails to identify any authority suggesting that the Fourth Circuit's "open to adjudicate" standard requires either of these procedures. Further, though Article IX, Section 4 of the Virginia Constitution limits Plaintiff's ability to challenge the Commission's actions in a different state forum, and even assuming *arguendo* that Plaintiff could not have raised a facial challenge to the VHCA as part of its appeal, nothing in the relevant statutory scheme or in any other provision of Virginia law circumscribes Plaintiff's ability to sue in Virginia's courts for a declaratory judgment that the VHCA is facially unconstitutional. *See* Va. Code § 8.01-184 (providing for declaratory judgment suits in Virginia circuit court); VA.

25

CONST. ART. IX, § 4 (stripping state courts of jurisdiction only as to challenges to "action[s] of the Commission" and suits "to enjoin or restrain [the Commission] in the performance of its official duties"). As such, Plaintiff fails to persuade the Court that it had no reasonable, certain and adequate method to challenge the Commission's Final Order and the VHCA under the federal Takings Clause in state court.

The Court arrives at the same conclusion for prong (2) of its analysis. Plaintiff's argument that it would be unable to obtain just compensation within the existing state law mechanism parallels that of the plaintiffs in *Zito*. There, the plaintiffs argued that, because invalidation of the state commission order at issue constituted the only available remedy in North Carolina court, and "[b]ecause invalidation [of a state commission order] does not compensate the plaintiff for any temporary taking . . . North Carolina courts do not provide an adequate avenue for just compensation." *Zito*, 8 F.4th at 288. The state defendants countered that, in such an instance, "the plaintiff may bring a subsequent suit . . . to obtain compensation for the temporary taking," obviating any concern that the state court provided an inadequate remedy for the plaintiffs' takings claim. *Id.* Upon reviewing the relevant state law provisions, the *Zito* court rejected the plaintiffs' arguments, finding that "the North Carolina Constitution provides an independent cause of action for plaintiffs to seek damages for a takings claim," permitting the plaintiffs "to pursue damages after establishing . . . that the regulation amounted to a taking." *Id.* at 289 (internal citation omitted).

The *Zito* Court's reasoning applies with equal force under Virginia law. While the Virginia Constitution and the Rules of the Supreme Court of Virginia do not specifically define the relief that the Supreme Court may grant on an appeal of a Commission Order, Plaintiff concedes that the Court may, at minimum, vacate or reverse such an order. (Oppo. at 16.) Based

on its appellate filings, Plaintiff also understands the Supreme Court to possess the authority to issue orders "approv[ing Plaintiff's] proposed tolls" or remanding Plaintiff's application for further proceedings. (ECF No. 20-2 at 59.) Any such order would necessarily remedy the alleged taking by the Commonwealth of Virginia, leaving only the matter of just compensation for any "temporary taking" that may have occurred during the short period when the Supreme Court was considering Plaintiff's appeal. *Zito*, 8 F.4th at 288. To the extent that Virginia's statutory and constitutional framework prohibits the Supreme Court of Virginia from awarding Plaintiff such compensation as part of appellate proceedings,[12] Virginia law — much like North Carolina law — permits Plaintiff to sue separately for such relief. Pursuant to Va. Code § 8.01-187, any court that enters an order or decree declaring "that a person's property has been taken or damaged within the meaning of" the Virginia Constitution's takings clause "may, upon motion of such person . . . enter a further order appointing commissioners, condemnation jurors, or the court to determine just compensation."[13] And even if the Supreme Court determined that a

---

[12]   Though Plaintiff asserts that the Supreme Court of Virginia "cannot award just compensation for a taking or damages for a Bill of Attainder violation," it provides no citations in support of this claim. (Oppo. at 16.) Plaintiff's "see generally" citations to provisions governing Supreme Court review of Commission decisions fail to substantiate its assertion. Despite its best efforts, this Court was unable to find any cases where the Supreme Court of Virginia overturned decisions by the Commission; it therefore remains unable to corroborate Plaintiff's interpretation of Virginia law.

[13]   While the text of Va. Code § 8.01-187 appears to limit such just compensation actions to claims under Virginia law, that fact does not affect the Court's analysis, since Plaintiff's claims for just compensation under Virginia and federal law mirror one another, and since a successful recovery under the Virginia takings clause would necessarily foreclose recovery under its federal counterpart. *See Bogan v. City of Boston*, 489 F.3d 417, 425 (1st Cir. 2007) ("The law abhors duplicative recoveries; thus double awards for the same injury are impermissible.") (cleaned up); *Mason v. Okla. Tpk. Auth.*, 115 F.3d 1442, 1459 (10th Cir. 1997) ( "If a [§ 1983] claim and a state claim arise from the same operative facts, and seek identical relief, an award of damages under both theories will constitute double recovery."); *Medina v. D.C.*, 643 F.3d 323, 326 (D.C. Cir. 2011) (explaining the rationale behind the prohibition on double recovery as "when a

separate declaratory judgment action were necessary to obtain such relief,[14] Plaintiff has the ability to sue for such a judgment pursuant to Va. Code § 8.01-184. Thus, Virginia law affords Plaintiff the same avenue recognized in *Zito*: the ability "to pursue damages after establishing . . . that the [Commission's Order or the VHCA] amounted to a taking." *Id.* at 289. The Court therefore concludes that the second prong of the *Zito* analysis is satisfied as well.

For all of these reasons, the Court finds that Virginia courts remain "open to adjudicate" Plaintiff's federal takings claims. Plaintiff's claims seeking financial or declaratory relief for violations of the federal Takings Clause against the Commonwealth and the Commission therefore stand barred by the Eleventh Amendment and will be dismissed under Rule 12(b)(1) for lack of jurisdiction.

### 2.    Applicability to Claims Under Virginia Law

Plaintiff argues next that, under Virginia law, takings claims "do not implicate sovereign immunity," and that therefore, the Court need not consider issues of waiver and abrogation. (Oppo. at 18.) Pursuant to that theory, Plaintiff asserts that sovereign immunity does not shield any of its claims against Defendants under the Virginia Constitution's Takings Clause. (*Id.*)

Plaintiff's argument constitutes, at best, a red herring. In support of its claim of "non-implication," Plaintiff cites a recent Fourth Circuit case, *Jackson Creek Marine, LLC v. Maryland*, 153 F.4th 423, 430 (4th Cir. 2025), as its sole legal basis. However, *Jackson Creek*'s

---

plaintiff seeks compensation for wrongs committed against him, he should be made whole for his injuries, not enriched").

[14]    The Supreme Court of Virginia has recognized that "[a]n Act passed by the General Assembly inconsistent with or repugnant to the Constitution is invalid, and it is our duty to declare such an act unconstitutional." *Terry v. Mazur*, 362 S.E.2d 904, 908 (Va. 1987). The Court presumes that, if the Supreme Court of Virginia were to conclude that the Commission's Order or the statute authorizing it violated the Constitution, it would fulfill that "duty" without requiring Plaintiff to initiate a separate declaratory judgment action.

framing of what it means to "implicate" sovereign immunity bears no relevance to Plaintiff's argument. As the Fourth Circuit explained, suits "implicate" sovereign immunity "in two situations . . . . when the suit subjects the state to the coercive process of judicial tribunals" and "when the state, even if not subject to coercive process by name, is the real, substantial party in interest to the suit." *Id.* (internal citations and quotation marks omitted). The instant case clearly satisfies both criteria: the Commonwealth is one of the named defendants compelled to appear before this "judicial tribunal" and constitutes the "real, substantial party in interest to the suit," including as to Plaintiff's claims against the Commission and its Commissioners in their official capacities. *Id. Jackson Creek* dispels any ambiguity as to sovereign immunity's "implication" here by stating, point blank, that such immunity "is straightforwardly implicated when a state is sued by name." *Id.* at 432. The Court thus rejects the notion that Plaintiff's state law claims fail to "implicate" sovereign immunity and that the doctrines of waiver and abrogation are somehow "irrelevant" to the Court's consideration of Defendants' purported immunity.

Rather, the Court considers Plaintiff's argument for what it really is: an assertion of waiver. *See AGCS Marine Ins. Co. v. Arlington Cnty.*, 800 S.E.2d 159, 167–68 (Va. 2017) (characterizing the issue of the intersection between sovereign immunity and the Virginia Constitution's takings clause as one of waiver). Plaintiff highlights that the Commonwealth has historically treated takings claims as akin to contract actions, and that it has never asserted immunity to suit in such cases. (Oppo. at 18–19 (citing *Dr. William E.S. Flory Small Bus. Dev. Ctr., Inc. v. Commonwealth*, 541 S.E.2d 915, 918 (Va. 2001), and *Kitchen v. City of Newport News*, 657 S.E.2d 132, 140 (Va. 2017)) (other citations omitted).) Plaintiff's position finds support in Supreme Court of Virginia opinions declaring that "sovereign immunity does not bar . . . takings claims under Article 1, § 11" of the Virginia Constitution. *Montalla, LLC v.*

29

*Commonwealth*, 900 S.E.2d 290, 301 (Va. 2024). As such, takings claims under the Virginia Constitution constitute one of the areas where the Commonwealth of Virginia has categorically waived sovereign immunity in its own courts.

However, Plaintiff's argument fails to account for the United States Supreme Court's Eleventh Amendment jurisprudence, which requires a state to clearly and unequivocally waive its immunity to suit *in federal court*. The Court provided a summary of this jurisprudence in *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*:

> The decision to waive [a state's sovereign] immunity . . . is altogether voluntary on the part of the sovereignty. Accordingly, our test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one. Generally, we will find a waiver either if the State voluntarily invokes our jurisdiction, or else if the State makes a clear declaration that it intends to submit itself to our jurisdiction. Thus, a State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation.

527 U.S. 666, 675–76 (1999) (internal citations and quotation marks omitted); *see also Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 99 (1984) (holding that a state's consent to suit must be "unequivocally expressed").

The Supreme Court's approach to Eleventh Amendment waivers precludes Plaintiff's argument here. As the Court explained, Virginia did not "consent to suit in federal court" under the Virginia Constitution's Takings Clause "merely by consenting to suit in the courts of its own creation." *College Savings Bank*, 527 U.S. at 676. Nor do the Virginia Constitution or the Virginia Supreme Court's opinions concerning the Commonwealth's consent to suit under the Virginia Takings Clause express intent to waive the Commonwealth's immunity to such suits in federal court, much less "unequivocally." *Pennhurst*, 465 U.S. at 99. Under the "stringent" test imposed by the United States Supreme Court, and absent any indicators to the contrary, Plaintiff's argument for waiver fails.

30

This Court reached the same conclusion in a 2009 case involving claims against the Virginia Department of Transportation ("VDOT"). *Am. Bridge Co. v. Young*, 2009 WL 10731054 (E.D. Va. Apr. 6, 2009). In rejecting the argument that VDOT could be found liable in federal court for a takings claim under the Virginia Constitution's takings clause, the Court reasoned as follows:

> A state's immunity from suit in federal court pursuant to the Eleventh Amendment can only be lost where Congress has abrogated the state's sovereign immunity, or where the state waives its sovereign immunity by consenting to suit in federal court. There is no indication that Congress has abrogated Virginia's Eleventh Amendment immunity for suits arising under the takings clause of the Virginia Constitution. Neither does it appear that Virginia has waived its sovereign immunity by consenting to suit in federal court. The "test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." *College Sav. Bank*, 527 U.S. at 675. A state may waive Eleventh Amendment immunity either (1) by invoking federal jurisdiction, or (2) by making a "clear declaration" that it intends to submit itself to federal jurisdiction. *Id.* at 675–76. It does not appear that VDOT has done either.

*Id.* at *8 (other internal citations omitted). As already discussed, the same logic applies here: Defendants have neither invoked federal jurisdiction nor clearly declared their intent to submit themselves to federal jurisdiction. Plaintiff's remaining claims against the Commonwealth and the Commission under the Virginia Constitution thus stand barred by the Eleventh Amendment and must be dismissed accordingly.

### 3.    Pleading Artifice

The Court finally considers Defendants' argument that sovereign immunity should shield the Commissioners from all personal liability in this matter. Defendants assert that Plaintiff's claims for money damages against the Commissioners in their personal capacities seek damages for "official actions of the Commission" and effectively "operate against the Commission and Commonwealth." (Mem. at 20.) As such, Defendants ask the Court to disregard the Amended Complaint's "'personal capacity' label" as a "pleading artifice" and treat these claims as claims

31

against the Commissioners in their official capacities, thereby subjecting them to the same sovereign immunity bar discussed above. (*Id.* at 21.) Defendants rely heavily on *Martin v. Wood*, 772 F.3d 192 (4th Cir. 2014), arguing, under *Martin*'s factors for considering whether a claim against an official constitutes a personal capacity or official capacity claim, that Plaintiff's claims against the Commissioners fall squarely in the latter category. (Mem. at 21–23 (citing *id.* at 196).)

As a threshold matter, Defendants' arguments based on the *Martin* factors must be disregarded under binding Fourth Circuit precedent. As the court explained in *Adams v. Ferguson*, 884 F.3d 219 (4th Cir. 2018):

> Applying the *Martin* factors, which focus on the official character of the defendant's actions, to § 1983 claims would "absolutely immunize state officials from personal liability for acts within their authority and necessary to fulfilling governmental responsibilities." *Hafer [v. Melo]*, 502 U.S. [21,] 28 [1991]. We refuse to apply to § 1983 claims these factors, which we articulated for use in considering claims under a very different statute, and which would undermine the very purpose of § 1983.

*Id.* at 226. Instead, the Fourth Circuit considered "the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury," as the dispositive inquiry. *Id.* at 225 (quoting *Hafer*, 502 U.S. at 26). Finding the pleaded claim to validly constitute a personal capacity claim, the court pointed to the complaint's clear statement that the suit was asserted against the defendant "in her individual capacity," the lack of any indicators in the complaint that would undermine this assertion, the absence of any request for relief from the state, and the fact that the defendant had been replaced in her official position, but no substitution had been made in the lawsuit. *Id.*

The instant case presents a closer call than *Adams*. While the Amended Complaint's individual capacity counts are expressly pled as such, the majority of the Amended Complaint's

32

claims are directed at the state and the Commission directly, as well as the Commissioners in their official capacity. In addition, Plaintiff's individual capacity claims — to the extent that they pertain to the VHCA and are therefore not barred by the Johnson Act — appear tethered solely to the Commissioners' official actions in enforcing the VHCA. Thus, unlike in *Adams*, the Court has no reason to believe that Plaintiff would continue to pursue *these* Commissioners for ongoing enforcement of the VHCA if they were replaced by other Commissioners in the future.

Despite these reservations, the Court refrains from reconstruing Plaintiff's personal capacity claims as official capacity claims at this stage, for three reasons. First, the Court finds no fault with Counts III and VIII from a pleading standpoint. The counts clearly delineate claims against the Commissioners "in their Personal Capacities," invoking Section 1983, the Commissioners' actions "under color of state law," and the specific actions taken by the Commissioners that purportedly violated Plaintiff's rights, and they seek "compensatory and other damages" for these alleged constitutional violations. (Am. Compl. at 24–25, 31–32.) As such, Counts III and VIII contain no obvious pleading defects and appear, on their face, to state valid claims against the Commissioners in their personal capacities. *See Gibbons v. Gibbs*, 99 F.4th 211, 216 (4th Cir. 2024) ("[T]his Court has stated that a plaintiff's request for compensatory damages in a Section 1983 suit may itself be evidence that a state officer is being sued in their personal capacity[,] since such relief is unavailable in official capacity suits.") (cleaned up).

Second, the Court notes that the Fourth Circuit has repeatedly rejected attempts to convert personal capacity suits into official capacity suits, expressing significant skepticism for such arguments along the way. *See, e.g., Adams*, 884 F.3d at 224–26; *Gibbons*, 99 F.4th at 216

(rejecting the argument that individual capacity claims under Section 1983 should be viewed as official capacity claims, because "the complaint makes clear that Gibbons' request for damages from the board members applies only if the board members are proven at trial to have engaged in the violations . . . in their personal capacities, and that Gibbons seeks to hold them liable 'as individuals.'") (citations omitted). Rather than address this skepticism in the case law, Defendants continue to rely on the *Martin* factors, despite the Fourth Circuit's express rejection of this approach, and its *reaffirmation* of that rejection barely two years ago. *Adams*, 884 F.3d at 225–26; *Gibbons*, 99 F.4th at 215–16. Defendants' reliance on a framework that the Fourth Circuit has repeatedly rejected does little to alleviate the Court's concerns.

Finally, the Court remains mindful of the procedural posture and its duty, even in its jurisdictional analysis, to accord Plaintiff's pleadings significant deference and to view factual allegations in the light most favorable to Plaintiff. Where Plaintiff represents that it seeks to hold the individual Commissioners accountable as individuals, the Court need not second-guess the good faith nature of Plaintiff's pleadings. To the extent that Plaintiff's claims against the Commissioners in their individual capacities survive the Court's preclusion analysis, *see infra* § III.C., the Court believes that qualified immunity provides the more appropriate framework for evaluating Defendants' arguments against Plaintiff's individual capacity claims.

Accordingly, the Court considers Counts III and VIII to assert Section 1983 claims against the Commissioners in their individual capacities, as stated in the Amended Complaint. Since sovereign immunity does not shield such claims, the Court may exercise jurisdiction over these Counts to the extent permitted under the Court's Johnson Act analysis. *See supra* § III.A.

* * *

34

In sum, the Court finds that the Eleventh Amendment shields Defendants Virginia and the Commission from any of Plaintiff's claims seeking just compensation, money damages and declaratory relief. The Court will therefore dismiss Count I (except Plaintiff's injunctive and declaratory relief claims against the Commissioners in their official capacity) and Count IV.

In light of the Johnson Act's jurisdictional bar and the applicability of Eleventh Amendment sovereign immunity, the Court finds that it may exercise jurisdiction over the following two categories of claims only: (1) Plaintiff's claims for injunctive and declaratory relief against the Commissioners acting in their official capacity (Counts I and VI); and (2) Plaintiff's damages claims against the Commissioners in their individual capacities as these relate to enforcement of the VHCA only (Counts III and VIII). The Court proceeds to analyze Defendants' arguments for dismissal of these remaining counts.

### C.    Preclusion Doctrines

Defendants next assert that the Supreme Court of Virginia's opinion affirming the Commission's Final Order exercises preclusive effect over Plaintiff's remaining claims and therefore bars this Court from adjudicating them. (Mem. at 23–25.) The full faith and credit statute, 28 U.S.C. § 1738, requires federal courts to grant preclusive effect to state court decisions. *Zito*, 8 F.4th at 286. Res judicata (or claim preclusion) and collateral estoppel (or issue preclusion) constitute affirmative defenses that a party may raise in a motion to dismiss. *Thomas v. Consolidation Coal Co.*, 380 F.2d 69, 75 (4th Cir. 1967); *Marshall v. Marshall*, 523 F. Supp. 3d 802, 835 (E.D. Va. 2021). These affirmative defenses "may be raised under Rule 12(b)(6) only if [the defense] clearly appears on the face of the complaint." *Andrews v. Daw*, 201 F.3d 521, 524 n.1 (4th Cir. 2000) (internal quotations omitted). "In considering the preclusive effect of an earlier state court judgment on a new claim, [the Court must] apply the

35

preclusion law of the State in which judgment was rendered." *Bennett v. Garner*, 913 F.3d 436, 440 (4th Cir. 2019) (internal quotations omitted). Virginia law recognizes both issue and claim preclusion. *Funny Guy, LLC v. Lecego, LLC*, 795 S.E.2d 887, 890 (Va. 2017) (citation omitted). As the Supreme Court of Virginia succinctly stated, the animating rationale behind these doctrines, "[s]imply put, [is that] the law should afford one full, fair hearing relating to a particular problem — but not two." *Alexander v. Cobb*, 838 S.E.2d 227, 231 (Va. 2020) (cleaned up).

"Under the doctrine of claim preclusion, a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'" *Lee v. Spoden*, 776 S.E.2d 798, 803 (Va. 2015) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001) (other citations omitted)). Stated differently, "parties may not relitigate the same cause of action or any part thereof which *could* have been litigated in the previous action." *Passaro v. Virginia*, 935 F.3d 243, 250 (4th Cir. 2019) (internal quotation marks omitted) (emphasis in original). Rule 1:6 of the Rules of the Supreme Court of Virginia sets forth the governing law of claim preclusion in Virginia:

> A party whose claim for relief arising from identified conduct, a transaction, or an occurrence, is decided on the merits by a final judgment, is forever barred from prosecuting any second or subsequent civil action against the same opposing party or parties on any claim or cause of action that arises from that same conduct, transaction or occurrence, whether or not the legal theory or rights asserted in the second or subsequent action were raised in the prior lawsuit, and regardless of the legal elements or the evidence upon which any claims in the prior proceeding depended, or the particular remedies sought.

Va. Sup. Ct. R. 1:6(a). Thus, a party arguing for claim preclusion must make three showings: (1) the original claim was decided on the merits by a final judgment; (2) the same parties are present in both suits; and, (3) the suit is based on the same conduct, transaction or occurrence. *Marshall*, 523 F. Supp. at 834 (citing *Lee*, 776 S.E.2d at 804–06).

36

Even under Rule 1:6's "sweeping and mostly unqualified language," claim preclusion "largely depends on which claims *could* have been brought in the earlier action." *Passaro*, 935 F.3d at 250 (citing *Funny Guy*, 795 S.E.2d at 890) (internal quotation marks omitted). As the Fourth Circuit emphasized, Rule 1:6 "assumes no formal barriers in the way of a litigant's presenting to a court in one action the entire claim including any theories of recovery or demands for relief that might have been available to him under applicable law." *Id.* (citing Restatement (Second) of Judgments § 26(1)(c) cmt. c (Am. Law Inst. 1982)) (internal quotation marks and emphasis omitted).

The doctrine of issue preclusion, meanwhile, precludes parties from relitigating issues of law or fact "actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). A party seeking to assert issue preclusion under Virginia law must establish the following four elements: (1) the parties [or their privies] to the two proceedings must be the same; (2) the issue of fact sought to be litigated must have been actually litigated in the prior proceeding; (3) the issue of fact must have been essential to the prior judgment; and (4) the prior proceeding must have resulted in a valid, final judgment against the party against whom the doctrine is sought to be applied. *Lane v. Bayview Loan Servicing, LLC*, 831 S.E.2d 709, 714 (Va. 2019) (citation omitted).

Under either doctrine, the party asserting preclusion as a defense "has the burden of proving by a preponderance of the evidence that the claim or issue is precluded by a prior judgment." *Scales v. Lewis*, 541 S.E.2d 899, 901 (Va. 2001).

37

Defendants assert that Plaintiff's claims under the federal Takings Clause stand barred by both issue and claim preclusion.[15] Defendants' arguments focus primarily on issue preclusion, asserting that Plaintiff "directly litigated whether the Commission's Final Order, including its application of [the VHCA as amended], violated the state and federal Takings Clauses" and that Plaintiff "cannot now relitigate those exact questions after losing in state court." (Mem. at 24.) As to Plaintiff's Bill of Attainder claims (Counts VI and VIII), Defendants argue that these claims also stand precluded under both doctrines, for the following reasons. As to claim preclusion, Defendants submit that Plaintiff "could have asserted this argument in the state proceedings but declined to do so, precluding its ability to raise it" before this Court. (*Id.*) And as to issue preclusion, Defendants assert that under the "historical prong of the test governing" Plaintiff's Bill of Attainder claims, Plaintiff "must demonstrate that the challenged government action was a 'punitive confiscation of property.'" (*Id.*) Since the Supreme Court of Virginia determined that the Commission's Final Order "did not confiscate property," and given the preclusive effect of the Court's determination of this issue, Plaintiff's Bill of Attainder claims stand similarly barred. (*Id.* at 24–25.)

Plaintiff opposes these arguments along several lines. First, Plaintiff asserts that both the Commission's Final Order and the Supreme Court of Virginia's opinion disposing of Plaintiff's appeal of that Order categorically lack preclusive effect. As to the Final Order itself, Plaintiff argues that the Commission's decision constitutes the exercise of a "legislative function delegated to it by the [Virginia] General Assembly," rather than an adjudicative function, and therefore cannot have preclusive effect in a court. (Oppo. at 22 (citations omitted).) As to the

---

[15] Defendants make the same arguments as to Plaintiff's state law claims. Since the Court has already dismissed these claims for lack of jurisdiction, this discussion focuses solely on Plaintiff's remaining federal law claims.

Virginia Supreme Court's opinion, Plaintiff relies on *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210 (1908), where the United States Supreme Court stated, in dicta, that the hypothetical confirmation of a Commission decision by the Supreme Court of Virginia would not have had any preclusive effect. (*Id.*) Plaintiff further invokes the general proposition that "appellate review cannot expand the preclusive effect of the decision being reviewed" and cites a district court opinion out of Michigan, which held that review of an agency order "merely affirms the preclusive consequences of that order, rather than creating its own judgment with its own preclusive consequences." (*Id.* at 22–23 (quoting *Allan v. Realcomp II, Ltd.,* 2012 WL 12929751, at *8 (E.D. Mich. May 28, 2012)).) On the basis of these two cases, Plaintiff argues that the Supreme Court of Virginia "did not enter a final judgment here," and that its opinion "did not transform the legislative nature" of the Commission's Final Order "into a preclusive judgment." (*Id.* at 23.)

In the alternative, Plaintiff argues that even if the Court found either the Final Order or the Supreme Court of Virginia's opinion to constitute a preclusive judgment, their preclusive effect would be strictly circumscribed. (*Id.*) As to claim preclusion, Plaintiff asserts that it "could not have brought *any* affirmative constitutional claims before the Commission (or, obviously, on appeal)" and that therefore, such claims cannot be precluded under a res judicata rationale. (*Id.*) And as to issue preclusion, Plaintiff contends that the Supreme Court of Virginia "did not reach any challenges to the [statute] based on takings or bill-of-attainder arguments," presumably implying a limited preclusive scope. (*Id.* at 23–24.) Finally, Plaintiff argues that neither preclusion doctrine applies to its claims against the Commissioners in their individual capacities, since government officials acting in their official capacity cannot be in privity with themselves in their individual capacity. (*Id.* at 24.)

The Court begins by considering whether either the Commission's Final Order or the Supreme Court of Virginia's opinion warrants preclusion of Plaintiff's remaining claims, which concern the constitutionality of (1) the VHCA under the federal Takings Clause (Count I); (2) the VHCA under the federal Bill of Attainder Clause (Count VI); (3) the Commissioners' actions in enforcing the VHCA under the federal Takings Clause (Count III); and (4) the Commissioners' actions in enforcing the VHCA under the federal Bill of Attainder Clause (Count VIII). As a threshold matter, Defendants do not appear to contest that the Commission's Final Order was legislative in nature, and that therefore, the Order, standing alone, lacks preclusive effect under Virginia law. The relevant case law compels such a finding. *See Chilton-Belloni v. Angle for City of Staunton*, 806 S.E.2d 129, 133 (Va. 2017) ("Only what is adjudicated can be res judicata. Administrative action other than adjudication cannot be res judicata."); *Potomac Edison Co. v. State Corp. Comm'n*, 667 S.E.2d 772, 777–78 (Va. 2008) (finding that, where utility applied to the Virginia State Corporation Commission for a rate adjustment, the utility "was asking the Commission to exercise its ratemaking authority, a legislative function delegated to the Commission by the General Assembly," and that the Commission "exercised its legislative authority" in denying that application); *Bd. of Supervisors of Loudoun Cnty. v. State Corp. Comm'n*, 790 S.E.2d 460, 465 (Va. 2016) (finding that, under the VHCA, "[a]s with other ratemaking procedures for public utilities, the General Assembly has delegated broad discretion to the Commission for the performance of the *legislative* function of setting toll rates") (emphasis added). Accordingly, the Court considers only the preclusive effect (if any) of the Supreme Court of Virginia's opinion.

Plaintiffs assert that this opinion categorically lacks preclusive effect, because a "mere affirmance" of a rate order possesses no independent meaning, for res judicata purposes, from

40

the underlying rate order itself. (Oppo. at 22.) Under that logic, where the rate order constituted a purely *legislative* act (which, as already discussed, exercises no preclusive effect in a future judicial proceeding), the affirmance of that rate order retains the order's legislative character and therefore similarly lacks any preclusive effect. (*Id.*) Defendants, in turn, make a similarly sweeping argument in the opposite direction, arguing that the Supreme Court of Virginia's recognition of its limited capacity to assess the propriety of legislative actions by the Commission establishes that "[t]he Supreme Court of Virginia no longer exercises legislative power in its review of a Commission rate order," and that therefore, any review of such orders by the Supreme Court of Virginia enjoys "full preclusive effect." (Reply at 19 (citing *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 480 (1982)).

The Court finds neither categorical argument persuasive. Plaintiff's argument assumes, in essence, that the Virginia Supreme Court performs only a cursory, deferential review of the Commission's orders for legislative propriety. The record in this case belies that assumption. Where the Commission's Final Order did not address Plaintiff's constitutional concerns beyond a cursory dismissal,[16] the Supreme Court spent several pages analyzing the Final Order's constitutionality under the federal Takings Clause, applying a *de novo* standard of review. *See* Va. S. Ct. Opinion at 40, 41–43. Defendants' argument, meanwhile, advocates for a *per se* finding that any and all review of rate orders by the Supreme Court of Virginia necessarily possesses full preclusive effect, based on a chain of inferences concerning the deferential standard the Court applies in *some* aspects of its review. Much like Plaintiff, Defendants' argument is premised on a selective reading of the law that stands belied by the record in this

---

[16]    *See* Final Order at *7 ("The Commission concludes that constitutional considerations, as addressed in the instant record, do not necessitate approval — in violation of the statute — of the specific Proposed Tolls that have been requested in this proceeding.").

case, where the Supreme Court engaged in a much more hands-on review of the Commission's work.

Therefore, and in light of this case's unique circumstances and the absence of clear guidance from the caselaw, this Court returns to first principles and analyzes the preclusive effect of the Supreme Court's opinion under the core criteria of Virginia preclusion law. Pursuant to that analysis, the Court concludes that the Supreme Court's opinion constitutes a final judgment with preclusive effect on the issue of the Final Order's constitutionality under the federal Takings Clause. However, the Court finds that the opinion has no claim preclusive effect on Plaintiff's facial challenges to the VHCA under the Takings and Bill of Attainder Clauses, because Defendants cannot establish that Plaintiff could have (but failed to) raise these challenges in the proceedings before the Commission.

### 1.    Claim Preclusion

As discussed above, to prevail on an argument for claim preclusion, Defendants need to establish that there were "no formal barriers in the way of" Plaintiff presenting its "entire claim" in the previous proceeding. *Passaro*, 935 F.3d at 250. Defendants fail to make such a showing. While Va. Code § 12.1-39 affords "any party aggrieved by any final . . . order, or judgment of the Commission" the right to appeal said order or judgment, the text and context of that provision strongly suggest that any such appeal stands strictly limited to the order being challenged and does not permit appellants to raise other challenges. Va. Code § 12.1-39 expressly limits its jurisdiction-stripping provision to "action[s] of the Commission". Meanwhile, § 12.1-40 dictates that "[t]he method of taking and prosecuting any appeal from the Commission shall be as provided by the rules of the Supreme Court." These rules specifically provide, in cases of appeal from the State Corporation Commission, that "[t]he petition for

42

appeal must identify the order appealed from and the date of the order [and] contain assignments of error," which assignments "must clearly and concisely and without extraneous argument identify the *specific errors in the rulings below* upon which the party intends to rely." Va. S. Ct. Rule 5:21(a)(3), (7) (emphasis added). Notably, "no error not so assigned will be considered as grounds for reversal of the decision below." Va. S. Ct. Rule 5:21(a)(7); *see also Tanner v. State Corp. Comm'n,* 574 S.E.2d 525, 528 n.2, *on reh'g in part,* 580 S.E.2d 850 (2003) (rejecting additional challenge beyond the State Corporation Commission order, because that "issue was not raised before the Commission; therefore, we will not consider it for the first time on appeal," and citing Rule 5:21). Beyond their conclusory assertion that Plaintiff "could have asserted" its Bill of Attainder argument "in the state proceedings but declined to do so," (Mem. at 24), Defendants provide no argument or authority supporting the notion that Plaintiff could have asserted a facial challenge to the VHCA as part of its appeal. As such, Defendants fail to meet their burden in establishing that Plaintiff could have presented its "entire claim" before the Supreme Court of Virginia as part of its appeal of the Final Order, barring claim preclusive effect here. *Passaro,* 935 F.3d at 250.

### 2.    Issue Preclusion

#### a.    Applicability to Supreme Court of Virginia's Determination

Defendants' arguments concerning issue preclusion prove more persuasive. To prevail on their argument that the Supreme Court of Virginia preclusively answered the question of whether the Commission's Final Order violated the federal Takings Clause, Defendants must establish that in the prior proceeding (1) the parties (or their privies) were the same, (2) the issue was actually litigated, (3) the issue's resolution was essential to the judgment, and (4) the proceeding resulted in a valid, final judgment against Plaintiff. *Lane,* 831 S.E.2d at 714.

43

Beyond Plaintiff's categorical argument concerning the legislative nature of the Final Order (which this Court already rejected), Plaintiff questions whether the Supreme Court's opinion properly constitutes a "judgment with its own preclusive consequences." (Oppo. at 23 (quoting *Allan*, 2012 WL 12929751 at *8).) Plaintiff also suggests that the "actually litigated" prong has not been satisfied, because the Supreme Court "resolved only the federal takings challenge to the Final Order" and failed to reach the facial challenges to the VHCA's validity. (*Id.* at 23–24.) Finally, Plaintiff challenges the privity of the Commissioners in their personal capacities with the parties in the original appeal. (*Id.* at 24.) Plaintiff offers no argument as to the third element — the essentiality of the issue's resolution to the Supreme Court's judgment — conceding the point. *See. e.g., Ferdinand–Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (dismissing claim where plaintiff failed to respond to defendant's argument). The Court therefore focuses on whether the Supreme Court's determination of the Final Order's constitutionality satisfies the other three requirements for issue preclusive effect.

Turning first to Plaintiff's argument that the issue of the Final Order's constitutionality was not "actually litigated and determined," the Court finds this argument without merit. Plaintiff appears to conflate the doctrines of issue and claim preclusion. While Plaintiff correctly asserts that issue preclusion "applies only to those questions actually litigated and determined," Plaintiff then proceeds to focus on the nature of the *challenge* — its as-applied challenge to the Final Order versus its facial challenge to the VHCA. (Oppo. at 15–16.) The Court has already agreed with Plaintiff's argument as to *claim* preclusion; however, the Supreme Court's failure to address Plaintiff's facial concerns about the VHCA does not affect whether the *issue* of the Final Order's constitutionality under the federal Takings Clause was actually litigated in state court. As such, the Court dismisses Plaintiff's argument on this requirement as meritless.

44

Plaintiff's strongest objection concerns the issue of whether the Supreme Court of Virginia's opinion constituted a "final judgment" for issue preclusion purposes. Under Virginia law, "[a]n order is a final order if it disposes of the whole subject, gives all the relief contemplated . . . and leaves nothing to be done in the cause save to superintend ministerially the execution of the order." *Alexander*, 838 S.E.2d at 231 (citation and internal quotation marks omitted). "A judgment is on the merits when it amounts to a decision as to the respective rights and liabilities of the parties." *Storm v. Nationwide Mut. Ins. Co.*, 97 S.E.2d 759, 761 (Va. 1957) (citation and internal quotation marks omitted).

Plaintiff's argument runs along two lines. First, Plaintiff argues that the Supreme Court's opinion "merely affirm[ed]" the Commission's order and thus fails to constitute "its own judgment." (Oppo. at 23 (quoting *Allan*, 2012 WL 12929751, at *8).) Second, Plaintiff suggests that by merely determining whether the Commission would be "permitted to establish and enforce an unconstitutional rule," the Supreme Court remained within the legislative realm (rather than the adjudicative realm), further undermining the opinion's validity as a "final judgment." (*Id.* (quoting *Prentis*, 211 U.S. at 229).)

Upon review of the relevant case law and the record in this case, the Court finds both of Plaintiff's arguments to lack merit. As a threshold matter, Plaintiff's characterization of the Supreme Court of Virginia's findings regarding the Final Order's constitutionality as a "mere affirmance" fails to account for the scope and substance of that opinion. To begin, the Court notes that the Final Order provides no explanation of its constitutional finding. Final Order at *7. As such, the Supreme Court painted on a blank canvas in articulating its reasons supporting the Final Order's constitutionality, going well beyond "merely affirming" what occurred below. Further, the Court notes the Supreme Court's express invocation of *de novo* review for matters of

45

law, Va. S. Ct. Opinion at 40, as reflected in the Court's multi-page constitutional analysis. And in arriving at its conclusion that the Court "cannot say that the Commission's refusal to grant a toll increase under these circumstances constitutes a taking," the Court demonstrated no deference to the Commission's findings whatsoever. *Id.* at 43. This discussion stands in notable contrast to the Supreme Court's analysis of the propriety of the Commission's actions under the applicable VHCA provisions, wherein it limited itself to considering solely whether the Commission erred, and where it affirmed the Final Order on the basis that the Commission "could readily conclude on this record" that Plaintiff's proposed rates failed to satisfy the statutory criteria. *Id.* at 40. To the extent that any part of the Supreme Court's opinion constituted a "mere affirmance," that label extends, at best, to its deferential assessment of the Order's propriety under the VHCA, not to its constitutionality analysis.

Plaintiff's assertion that the Order fails to constitute "its own judgment" fails to alter that picture. Plaintiff's argument relies almost entirely on *Allan v. Realcomp II, Ltd.*, a district court case out of Michigan that sought to address whether an appellate opinion affirming a decision by the Federal Trade Commission ("FTC") possessed issue preclusive effect. 2012 WL 12929751. In that case, the court confronted a scenario where "a federal statute specifically prohibit[ed] the Court from giving collateral estoppel effect to the findings of the FTC," requiring the court to determine whether a Sixth Circuit affirmance of FTC findings could serve as a workaround for that statutory prohibition. *Id.* at *6. Emphasizing the general precept that appellate decisions "do[] not have res judicata and collateral estoppel effect standing on [their] own," but merely "establish[] what the preclusive effect of the judgment of the lower court or agency will be," the court highlighted that the Sixth Circuit's affirmance of the FTC findings held that "substantial evidence supports the *Commission*'s findings" and thus "merely affirmed the findings made by

46

the FTC" without leaving any "*judgment* of its own behind from which preclusive consequences could flow." *Id.* (emphases in original). In distinguishing the plaintiff's primary case that arrived at a contrary conclusion, the court emphasized the centrality of the federal statute at issue and distinguished the other case, in significant part, because the "issue created by [the statute's] collateral estoppel prohibition was not before" the other court. *Id.*

The Court disagrees with Plaintiff's argument, for two primary reasons. First, the Court finds *Allan* inapposite to the case at hand. As the preceding discussion demonstrates, the nature of the appellate affirmance discussed in *Allan* varies in both kind and degree from the Supreme Court of Virginia's opinion in this case. Unlike the Sixth Circuit, the Virginia Supreme Court made no finding whatsoever as to the support for any "findings" by the Commission, instead engaging in a *de novo* review of the constitutional question presented. As such, the conclusion in *Allan* that the reviewing court "merely affirmed" earlier findings without rendering any "judgment of its own" stands entirely distinguishable from the Supreme Court's review in this case. Second, the Court finds *Allan*'s conclusions concerning the lack of preclusive effect of appellate judgments to diverge significantly from other portions of the case law, including several United States Supreme Court cases dealing with this precise issue. *See Kremer,* 456 U.S. at 479–80 (holding that, where the New York State Division of Human Rights rejected plaintiff's employment discrimination case as meritless, and where that decision was affirmed by the state appellate court, the federal district court was required to give preclusive effect to the court's judgment upholding the agency's decision)[17]; *Napa Valley Electric Co. v. Railroad Commission,*

---

[17]    The *Kremer* Court further held that "state proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause in order to qualify for the full faith and credit guaranteed by federal law." 456 U.S. at 481. Since Plaintiff does not challenge the propriety of the process that it received in the Virginia proceedings, the Court need not further consider this issue.

251 U.S. 366, 372–73 (1920) (holding that the California Supreme Court's denial of a certiorari petition to review a rate order by the California Railroad Commission was "tantamount to a decision of the [Supreme] court that the orders and decisions of the Commission did not . . . violate any right of the several petitioners under the Constitution of the United States" and that therefore, "the denial of the petition was necessarily a final judicial determination" with collateral estoppel effect); *Grubb v. Pub. Utilities Comm'n of Ohio*, 281 U.S. 470, 478–79 (1930) (affirming that a judgment of the state supreme court sustaining the public utilities commission's order prohibiting operation of a bus line over an interstate bridge held res judicata effect over a suit in federal court to enjoin enforcement of the commission's order). The tension between *Allan*'s pronouncements on preclusion and this case law, paired with *Allan*'s minimal citations in support of its conclusions, significantly undermine both its persuasive power and Plaintiff's argument. Given the case law supporting a contrary outcome, the Court finds Plaintiff's argument that state court affirmances of administrative decisions categorically fail to constitute "final judgments" for preclusion purposes to lack merit and rejects it accordingly.

Finally, the Court rejects Plaintiff's argument that the Supreme Court of Virginia's review of the Final Order lacks preclusive power due to that Order's legislative nature. Plaintiff's argument relies almost entirely on *Prentis v. Atlantic Coast Line Co.,* a nearly 120-year-old Supreme Court case whose primary holding states that "[p]roceedings legislative in nature are not proceedings in a court," and that any "decision upon them cannot be *res judicata* when a [subsequent] suit is brought." 211 U.S. 210, 226–27 (1908). *Prentis* proceeds to state, in dicta, that the lack of preclusive power of a legislative proceeding "would be equally true if an appeal had been taken to the supreme court of appeals [of Virginia] and it had confirmed the rate." *Id.* at 227. The Court reasoned that the Virginia court's "action in doing so would not

have been judicial," because "[l]itigation cannot arise until the moment of legislation is past." *Id.* at 227–28. Notably, the Court defined the distinction between legislative and judicial acts as follows:

> A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial, in kind . . . .

*Id.* at 226.

Setting aside that Plaintiff fails to cite any opinions from the intervening 120 years that adopt or otherwise reaffirm *Prentis*'s dicta extending the rigid distinction between legislative and adjudicative functions into the appellate realm, the Court finds that, even under *Prentis*'s logic, this distinction fails to hold with regard to the Virginia Supreme Court's opinion in this case. Following its deferential affirmance of the Final Order's propriety under the statutory criteria, the Court engaged in a separate, thorough analysis of the Order's constitutionality "under laws [that] already [] exist." *Id.* That inquiry did nothing to "change[] existing conditions" or "mak[e] [] a rule for the future," *id.*; rather, it considered an existing decision in the light of existing constitutional law, surveyed the body of Supreme Court caselaw addressing the issues presented, and arrived at a declaration of the Final Order's constitutionality under this body of law. In *Prentis*'s language, the "moment of legislation" was, indeed, past — rendering the Court's *de novo* review of the Final Order's constitutionality a judicial act, not a legislative one. *Id.* The case law cited above supports this reading of the Virginia Supreme Court's actions, while further calling into question the authority, if any, of *Prentis*'s 1908 dicta. *See, e.g., Grubb*, 281 U.S. at 474, 478–79 (holding that a state supreme court's affirmance of a utilities commission order held preclusive effect and describing that review as "judicial review

49

culminating in a judgment"); *Kremer,* 456 U.S. at 479–80 (arriving at the same conclusion and similarly describing the court's affirmance as "judicial review"). The Court rejects Plaintiff's *Prentis*-based argument accordingly.

For all of these reasons, the Court finds that the Supreme Court of Virginia's opinion constitutes its own "final judgment" for issue preclusion purposes. The Court therefore turns to Plaintiff's final objection concerning the privity of the parties.

Plaintiff asserts that the Commissioners acting in their individual capacities are not in privity with the Commission or the Commonwealth, and therefore cannot be bound by any preclusive effect of the Supreme Court of Virginia's opinion.[18] Plaintiff relies for support on the Fourth Circuit's opinion in *Brooks v. Arthur*, where the court held that "a government official in his official capacity is not in privity with himself in his individual capacity." 626 F.3d 194, 201 (4th Cir. 2010).

In assessing the privity requirement for purposes of preclusion, the Fourth Circuit has emphasized that this requirement "assumes that the person in privity is so identified in interest with a party to former litigation that he represents *precisely the same legal right* in respect to the subject matter involved." *Andrews*, 201 F.3d at 525 (emphasis in original). In analyzing this question, the Fourth Circuit describes the "rule of differing capacities" in the preclusion context as providing that "a party appearing in an action in one capacity, individual or representative, is not thereby bound by or entitled to the benefits of the rules of res judicata in a subsequent action in which he appears in another capacity." *Id.* (quoting Restatement (Second) of Judgments

---

[18]    Plaintiff does not challenge the privity of Defendants Virginia and the Commission, both of whom constituted parties to the Supreme Court of Virginia appeal. Plaintiff also appears to concede that the Commissioners stand in privity with the Commission when acting in their official capacities. (Oppo. at 24.)

50

§ 36(2) (1982)) (cleaned up).  The court explained that the rationale for this rule stems from the fact that, "in appearing as a representative of another, a person should be free to take positions inconsistent with those he might assert in litigation on his own behalf or on behalf of others he represents in some other fiduciary capacity."  *Id.* (quoting Restatement (Second) of Judgments § 36 cmt. a (1982)).  The court identified several factors supporting such an approach, including the different nature of personal capacity suits, which "seek to impose personal liability upon a government official for actions he takes under color of state law," as opposed to official capacity suits, which "in essence are suits against the entity," and the different legal theories and defenses available in the different types of suits.  *Id.* (cleaned up).  The Fourth Circuit reaffirmed this precedent in *Brooks,* cited by Plaintiff, where the court vacated a district court's dismissal of a suit against correctional officers in their personal capacities based on the preclusive effect of an earlier disposition involving their employer.  626 F.3d 194, 203 (4th Cir. 2010).

Under this binding precedent, the Court finds that any preclusive effect of the Virginia Supreme Court's opinion stands limited to the Commonwealth, the Commission and the Commissioners acting in their official capacities, and that no such effect may extend to Plaintiff's claims against the Commissioners in their personal capacity.  While the Court is sympathetic to Defendants' arguments concerning the pleading artifice potentially at play in Plaintiff's personal capacity claims,[19] the Fourth Circuit commands that these claims be treated

---

[19]    The Court notes that several state supreme courts have adopted a different approach from the Fourth Circuit in cases similar to the one at bar.  Describing that contrary approach, the Ohio Supreme Court characterized it as applying res judicata to personal capacity claims, even where the initial claims concerned only official actions or state defendants, "if the alleged impropriety stems solely from acts performed in the defendant's official capacity."  *Kirkhart v. Keiper,* 805 N.E.2d 1089, 1093 (Ohio 2004).  Stated differently, "if the complaint does not allege that the individuals committed any improper acts separate and apart from acts performed in their official capacities, then the plaintiff is barred from pursuing his or her second lawsuit."  *Id.*; *see also Brown v. Osier,* 628 A.2d 125, 128–129 (Me. 1993) (finding that, where the defendants' actions

differently than those asserted against the Commonwealth and the Commissioners in their official capacities, given the potentially different litigating positions that the Commissioners may adopt in their personal capacities as well as the differing defenses available for both types of claims. *Andrews*, 201 F.3d at 525.

In sum, and for all of the reasons stated above, the Court finds that the Supreme Court of Virginia's determination that the Commission's Final Order did not violate the federal Takings Clause enjoys issue preclusive effect as to Plaintiff's claims against the Commonwealth, the Commission and the Commissioners acting in their official capacities.[20] That determination does not, however, exercise any preclusive effect over Counts III and VIII of the Amended Complaint, which address only the Commissioners in their personal capacities.

> **b.    Impact of Issue Preclusion On Plaintiff's Facial Challenges**

The Court turns next to considering the impact of this finding on the remaining live counts against the Commonwealth, the Commission and the Commissioners in their official capacities: Plaintiff's claim that the VHCA is facially unconstitutional under the federal Takings Clause (as to the Commissioners in their official capacity only) (Count I) and Plaintiff's claim that the VHCA is facially unconstitutional under the Bill of Attainder Clause (Count VI). Defendants argue that the Supreme Court of Virginia's preclusive determination of the Final

---

were performed as part of their official duties, the plaintiff "cannot be permitted to circumvent the sound principles of *res judicata* merely by including the word "individually" in his complaint."); *Lamb v. Geovjian*, 683 A.2d 731, 735 (Vt. 1996) ("[W]hen a party is sued as an individual for actions taken solely in her official role, res judicata may not be circumvented."); *see also Cohen v. Shea*, 788 F. Supp. 66, 68 (D. Mass 1992) ("a party cannot escape the rule of *res judicata* through expansive pleading.").

[20]    The Court notes that, while it already dismissed Counts Two and Five for lack of jurisdiction under the Johnson Act, the Supreme Court of Virginia's determination of the Final Order's constitutionality would have also precluded these claims, had the Court possessed jurisdiction to assess them.

Order's constitutionality mandates dismissal of both of these counts, for different reasons. As to Count I, Defendants assert that Plaintiff's facial challenge to the VHCA cannot succeed where an as-applied challenge to the same statute has already failed. (Mem. at 24 (citing *Mountain Valley Pipeline, LLC v. Hinz*, 2025 WL 897556, at *9 (W.D. Va. Mar. 24, 2025)).) Since the Supreme Court of Virginia found that the VHCA passed constitutional muster as applied to Plaintiff's rate order application, and since that finding applies with equal force to the instant proceedings and the parties implicated by Count I, Defendants argue that Plaintiff "cannot now argue that [the statute] is unconstitutional in all of its applications," dooming its facial challenge on federal takings grounds. (*Id.*) As to Count VI, Defendants argue that the Virginia Supreme Court's finding "that the Final Order did not confiscate property at all" necessarily defeats Plaintiff's claim under the federal Bill of Attainder Clause, since the "historical prong of the test" governing Bill-of-Attainder claims requires a plaintiff to demonstrate that the challenged government action constituted a "punitive confiscation of property," something that the Supreme Court already determined not to have occurred here. (*Id.* at 24–25.) On that basis, Defendants argue, Plaintiff fails to show that all applications of the VHCA violate the Bill of Attainder Clause, necessitating denial of Plaintiff's facial challenge under that Clause. (*Id.*)

The Court agrees with Defendants' arguments concerning Count I. "Under *United States v. Salerno,* 481 U.S. 739 (1987), a plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.,* that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *Salerno*, 481 U.S. at 745). Consequently, where a court has rejected an as-applied challenge to a statute, "defendants may not assert a facial challenge to the statute, as the Fourth Circuit has repeatedly — and recently —

53

noted." *Mountain Valley Pipeline, LLC*, 2025 WL 897556, at *9 (citing *United States v. Hasson*, 26 F.4th 610, 615 (4th Cir. 2022)); *Lumumba v. Kiser*, 116 F. 4th 269, 285 (4th Cir. 2024). Here, the Supreme Court of Virginia has determined that at least one set of circumstances exists in which the VHCA as amended is valid — namely those implicated by Plaintiff's rate order application and the Commission's rejection thereof. Va. S. Ct. Opinion at 42–43. As already discussed, that finding enjoys preclusive effect in the current litigation as to the original parties and their privies, which include the Commissioners in their official capacity. As such, Plaintiff's claim of facial unconstitutionality under Count I must fail, mandating dismissal of that count.

Defendants' argument as to issue preclusion and Plaintiff's Bill of Attainder claim falls short, however. Article I, Section 10, of the United States Constitution provides that "[n]o State shall . . . pass any Bill of Attainder." U.S. CONST. ART. I, § 10. "A legislative act is an unconstitutional bill of attainder if it singles out an individual or narrow class of persons for punishment without a judicial proceeding." *Lynn v. West*, 134 F.3d 582, 594 n.11 (4th Cir. 1998). To qualify as a bill of attainder, a law must (1) apply with specificity and (2) impose punishment. *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003). Courts employ three tests to determine whether a statutory provision imposes "punishment" for Bill of Attainder purposes: (1) a "historical" test that looks to traditional forms of legislative punishment, (2) a "functional" test that looks to the purposes served by the bill, and (3) a "motivational" test that looks to actual legislative motives. *Ameur v. Gates*, 759 F.3d 317, 329 (4th Cir. 2014). Critically, courts must apply these tests flexibly and cumulatively. *See Consol. Edison Co. of New York v. Pataki*, 292 F.3d 338, 350 (2d Cir. 2002) ("*ConEd*") ("*Nixon [v. Administrator of General Services*, 433 U.S. 425 (1977)] makes it clear that a statute need not fit all three factors to be considered a bill of attainder; rather, those factors are the evidence that is weighed together

54

in resolving a bill of attainder claim.") In that spirit, the United States Supreme Court expressly declared that "our inquiry is not ended by the determination that the Act imposes no punishment traditionally judged to be prohibited by the Bill of Attainder Clause." *Nixon*, 433 U.S. at 475. Rather, "new burdens and deprivations might be legislatively fashioned that are inconsistent with the bill of attainder guarantee." *Id.* As such, courts look "beyond mere historical experience" and may also apply the other tests. *Id.*

Defendants' argument fails to account for these other Court-sanctioned approaches to analyzing statutes under the Bill of Attainder Clause. As discussed, Defendants assert that "[t]o meet the *historical* prong of the test [for a Bill of Attainder claim, Plaintiff] must demonstrate that the challenged government action was a punitive confiscation of property." (Mem. at 24 (internal quotation marks omitted).) By Defendants' logic, since the Supreme Court of Virginia determined that the Final Order "did not confiscate property at all," and since the principle of issue preclusion bars Plaintiff "from relitigating this issue," Plaintiff's Bill of Attainder claim stands fatally undermined. (*Id.* at 25.) Even assuming *arguendo* that Defendants' characterization of the historical test and the Supreme Court's holding are correct, Defendants' argument fails to negate the potential validity of Plaintiff's claim under the functional and motivational tests, and it ignores the Supreme Court's express instruction to look "beyond mere historical experience." *Nixon*, 433 U.S. at 475. As such, Defendants' argument that Count VI must be dismissed on the basis of the Virginia Supreme Court's findings concerning the confiscatory nature of the VHCA fails to persuade the Court.[21]

---

[21]    The Court engages in a more fulsome analysis of the merits of Plaintiff's Bill of Attainder arguments in the next section. *See infra* Sec. III.D.

For all of these reasons, the Court dismisses the remaining portion of Count I on issue preclusion grounds.[22] The Supreme Court of Virginia's finding concerning the constitutionality of the Final Order does not, however, impact Count VI.

### D.    Bill Of Attainder Claims (Counts Six and Eight)

Having found that Plaintiff's Bill of Attainder claims are not barred by issue preclusion, the Court turns to assessing their merits under the Rule 12(b)(6) standard.

In support of its claim that the VHCA constitutes an unconstitutional Bill of Attainder, Plaintiff provides the following allegations. As to the specificity or singularity element, Plaintiff alleges that the VHCA amendment in question "singled out [Plaintiff] for its effect," since Plaintiff constitutes "the only entity regulated by the VHCA." (Am. Compl. ¶ 162.) As to punitive intent, Plaintiff alleges that the bill's sponsors "made clear that [the VHCA Amendments were] intended to punish [Plaintiff]" for the significant debt that it had incurred and for "being a private entity with allegedly foreign ownership," with the intention of "forcing it into bankruptcy or forcing a sale to the Commonwealth." (*Id.* ¶ 163.) Plaintiff also alleges that the Virginia General Assembly's "intent in adopting" the bill was "to deny [Plaintiff] the opportunity to earn a reasonable return." (*Id.* ¶ 164.) As to the purported punishment imposed, Plaintiff alleges that the bill was "punitive in effect because it necessarily results in toll rates so low as to be unconstitutionally confiscatory." (*Id.* ¶ 165.) Plaintiff goes so far as to claim that the bill possessed "no valid legislative purpose other than punishment without a judicial trial." (*Id.*)

---

[22]    In light of the Court's earlier determinations concerning sovereign immunity, this ruling disposes of the only remaining aspect of Plaintiff's Count I.

Defendants counter that Plaintiff's allegations fail to state a valid claim under the Bill of Attainder Clause, even under Rule 12(b)(6)'s low bar. Defendants assert that the VHCA Amendments are "in no way a legislative finding of guilt, nor [do they] impose punishment" on Plaintiff. (Mem. at 31.) As to singularity, Defendants argue that Plaintiff's allegations fail, because they do not "show that [Plaintiff] is not 'a legitimate class of one,'" highlighting the VHCA's "generally applicable test" for "any proposed toll rates charged by an operator." (*Id.* (quoting *Nixon*, 433 U.S. at 472) (other citations and quotations omitted).) As to punishment, Defendants present a host of arguments why, under any of the tests for Bill of Attainder claims, Plaintiff's allegations fail to establish this element. The Court summarizes Defendants' arguments for each of the three tests.

Defendant first asserts that Plaintiff's allegations fail the historical test, which looks to similarities with "legislative acts inflicting punishment other than execution that were historically addressed to persons considered disloyal to the Crown or State." (*Id.* at 32 (quoting *Nixon*, 433 U.S. at 474 (internal quotation marks omitted)).) Defendants highlight the United States Supreme Court's invocation of what it considered historically relevant types of punishment, including "imprisonment, banishment, and the punitive confiscation of property by the sovereign." (*Id.* (quoting *Nixon*, 433 U.S. at 474). Since Plaintiff fails to plausibly allege confiscation, let alone punitive intent behind such confiscation, Plaintiff fails under the historical test. (*Id.*) Defendants further assert that Plaintiff fails to sufficiently allege a "retrospective focus" of the bill —an "indispensable element" of a Bill of Attainder claim. (*Id.* (quoting *ConEd*, 292 F.3d at 349).) Defendants argue that the statute fails to "adjudicate[] past conduct or pass[] judgment" on Plaintiff, and instead expressly requires a forward-looking analysis. (*Id.* (citing Va. Code Sec. 56-542(D).) As such, Defendants assert, the VHCA "lacks the

distinguishing feature of a bill of attainder" — "the substitution of a legislative for a judicial determination of guilt." (*Id.* at 33 (quoting *De Veau v. Braisted*, 363 U.S. 144, 160 (1960) (internal quotation marks omitted).)

Defendants also assert that Plaintiff's allegations fail to establish a valid Bill of Attainder claim under the functional test. Defendants argue that the "self-evident" purpose behind the VHCA Amendments — to "protect[] the public from excessive charges to use the toll road"— is nonpunitive. (*Id.*) Further, any detriment stemming from the VHCA Amendments "is not so disproportionate to the legitimate purposes of protecting the public's interest in reasonable toll rates that it belies any purported nonpunitive goals." (*Id.* at 34 (quoting *Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*, 909 F.3d 446, 455 (D.C. Cir. 2018)). Defendants also point out that rate regulation to protect the public interest "is commonplace." (*Id.*)

Finally, Defendants assert that Plaintiff's allegations also fail under the motivational test, since Plaintiff "pleads no facts establishing a legislative motive to punish." (*Id.*) Defendants highlight that the allegations of political hostility towards Plaintiff and the Greenway involve individual politicians who were not members of the General Assembly when the VHCA Amendments were passed, (*id.*), and that Plaintiff has taken key quotations related to these allegations out of context. (*Id.* at 34 n.3.) Defendants further cite Supreme Court case law holding that "isolated statements" by legislators "do not constitute the unmistakable evidence of punitive intent which is required before a Congressional enactment of this kind may be struck down." (*Id.* at 35 (quoting *Selective Serv. Sys. v. Minnesota Pub. Int. Rsch. Grp.*, 468 U.S. 841, 856 n. 15 (1984).)

In rebuttal, Plaintiff repeatedly highlights the Rule 12(b)(6) standard and that Plaintiff "need only provide enough factual allegations to raise a right to relief above the speculative

level." (Oppo. at 34 (citation omitted).)  Arguing to that forgiving standard, Plaintiff asserts that confiscation of property, as alleged here, constitutes a "legislatively imposed harm" that qualifies as "punitive per se." (*Id.* (quoting *ConEd,* 292 F.3d at 351.)  Plaintiff further underscores its allegation that the VHCA Amendments were adopted specifically for punitive purposes and asserts that the Court must accept these allegations as true. (*Id.*)  Plaintiff rejects Defendants' arguments concerning the purported non-punitive purposes of the VHCA, citing the Second Circuit *ConEd* opinion's rejection of a statute's potentially legitimate purposes where "nothing other than punishment could justify" the state legislature's actions. (*Id.* at 35 (citing *ConEd,* 292 F.3d at 353).)  Plaintiff again invokes *ConEd* as to its punitive motive allegations, quoting the Second Circuit's finding that "the stated intent of at least some legislators . . . to punish" the utility in that case "provided evidence of motive." (*Id.* (quoting *ConEd,* 292 F.3d at 355).)  Finally, Plaintiff asserts that its allegations concerning politicians' statements about Plaintiff's past mismanagement establish a "retrospective focus" sufficient to pass Rule 12(b)(6) muster. (*Id.* at 35–36.)

The Court agrees with Defendants and finds that Plaintiff fails to plausibly plead that the VHCA Amendments violate the federal Bill of Attainder Clause.  Assuming without deciding that the VHCA satisfies the Clause's specificity requirement, the Court finds that Plaintiff's allegations fail to plausibly plead that the statute imposes punishment.  As set forth above, Plaintiff advances two theories of punishment: a "punitive per se" theory, resting on its allegation that the VHCA Amendments "necessarily result[] in toll rates so low as to be unconstitutionally confiscatory" (Am. Compl. ¶ 165), and a punitive-intent theory, resting on its allegations that the bill's sponsors and the General Assembly acted "to punish" Plaintiff for its

debt and foreign ownership and to force a sale of the Greenway to the Commonwealth. (*Id.* ¶¶ 73, 163–64). The Court addresses each theory in turn.

Plaintiff specifically alleges that the "bill's supporters cast [Plaintiff's] debt . . . as evidence of mismanagement" and "attacked" Plaintiff's request for increased toll rates as "highway robbery." (*Id.* ¶ 11.) Plaintiff further alleges that unspecified "Loudoun County politicians have decried [Plaintiff's] 'foreign' ownership and accused it of engaging in 'highway robbery.'" (*Id.* ¶ 70.) Plaintiff also cites a 2012 investigation by the Commission into Plaintiff, which it asserts was "instigated" by "Loudoun County and a Loudoun member of the House of Delegates," and where these "instigators" sought unsuccessfully to lower existing tolls on the Greenway. (*Id.* ¶ 72.) Concerning the 2021 passage of the VHCA Amendments, Plaintiff cites the success of "members of the Loudoun County delegation in the General Assembly" in getting these amendments passed. (*Id.* ¶ 74.) Plaintiff alleges that the VHCA Amendments constitute a "threat to the survival of the Greenway and are intended to put Loudoun County in a much better negotiating position regarding [Plaintiff's] demise." (*Id.*) Plaintiff also asserts that one of the legislation's goals was "to force [Plaintiff] to sell the road to the Commonwealth." (*Id.*)

Even assuming the truth of these specific allegations, as it must, the Court finds that these allegations fail to plausibly establish punitive intent on the part of the only actors relevant to the present inquiry: the General Assembly members who actually voted to pass the VHCA Amendments. Plaintiff's allegations that local politicians, including General Assembly members, criticized Plaintiff's actions before voting on a bill that might negatively impact Plaintiff in the future are plainly insufficient to establish punitive intent. Politicians routinely criticize entities that they seek to regulate by legislation; under Plaintiff's logic, any such forward-looking legislation that affects only one entity at a given time would automatically

60

qualify as a Bill of Attainder, contrary to the case law's high bar for such a finding. *See, e.g., Communist Party of U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 83 (1961) (holding that "only the clearest proof could suffice to establish the unconstitutionality of a statute on" Bill of Attainder grounds). Nor do Plaintiff's allegations demonstrate that the purported "supporters" of the VHCA Amendments actually constituted the same "members of the Loudoun County delegation in the General Assembly" that voted for the legislation. (*Id.* ¶¶ 11, 70, 74.) And even if that were true, Plaintiff's allegations wholly fail to ascribe any punitive intent to members of the General Assembly who voted for the legislation, let alone a majority of those members. Finally, Plaintiff's allegations that the VHCA Amendments threatened the Greenway's survival and were intended to incentivize a sale to the Commonwealth do not establish punitive motive: such forward-looking aims, by Plaintiff's own framing, are not the retrospective punishment that the Clause targets. Plaintiff's blanket assertions about the "legislation's goals" and its "intent to punish," unsupported by specific factual allegations, thus fail to clear the Rule 12(b)(6) threshold.

Plaintiff also fails on its "punitive per se" theory. (Oppo. at 34.) Plaintiff cites *ConEd* for the proposition that certain types of "legislatively imposed harm," including the "punitive confiscation of property," may be "considered to be punitive per se." *ConEd*, 292 F.3d at 351. Even setting aside the circularity of this claim, Plaintiff's argument stands foreclosed by the Supreme Court of Virginia's preclusive finding — at least as to the Commissioners acting in their official capacity — that the Final Order did *not* constitute a confiscatory taking. *See supra* § III.C.2.a. The Court also agrees with and adopts the Supreme Court of Virginia's reasoning that the VHCA as amended does not preclude Plaintiff from obtaining a reasonable rate of return under the "many circumstances" implicated by the facts of this case, including Plaintiff's status

61

as a heavily indebted entity whose projections for ridership were based on "flawed assumptions" and by the legitimate "concerns of ratepayers." Va. S. Ct. Opinion at 43 (internal quotations omitted). Plaintiff's "punitive per se" theory therefore fails as well.[23]

For all of these reasons, the Court dismisses the remaining portions of Plaintiff's Bill of Attainder Claims (Counts VI and VIII) for failure to state a claim under Rule 12(b)(6).

### E.    Qualified Immunity

The Court finally turns to Defendants' argument that the doctrine of qualified immunity protects the Commissioners from Plaintiff's remaining claim for money damages under Count III. Qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Wingate v. Fulford*, 987 F.3d 299, 311 (4th Cir. 2021). In so doing, qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.'" *Barrett v. Pae Gov't Servs., Inc.*, 975 F.3d 416, 429 (4th Cir. 2020) (quoting *Stanton v. Sims*, 571 U.S. 3, 5 (2013)).

The Supreme Court has determined that state actors are protected by qualified immunity "unless (1) [the defendant] violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v.*

---

[23]    For many of the same reasons, the Court also disagrees with Plaintiff that the Amended Complaint sufficiently alleges a retrospective focus. Plaintiff largely rests its argument on the same statements by politicians critical of Plaintiff's past stewardship of the Dulles Greenway. (Oppo. at 35–36.) Much like its argument on punishment, Plaintiff's assertions here are doomed by the absence of allegations that such a retrospective focus animated, let alone informed, the politicians who actually advanced the legislation in this case. However, in light of the Court's finding that Plaintiff fails to establish the punishment element, the Court need not analyze the retrospective focus issue at this time.

*Wesby*, 583 U.S. 48, 62–63 (2018).  Determining what prong of this analysis to engage in first

rests within the trial court's discretion.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  "The

burden of establishing a qualified immunity defense rests on the official asserting the

defense."  *Wingate*, 987 F.3d at 311.

> To determine whether a right is clearly established, a court must:
>
> first look to cases from the Supreme Court, this Court, or the highest court of the state in which the action arose.  In the absence of directly on-point, binding authority, courts may also consider whether the right was clearly established based on general constitutional principles or a consensus of persuasive authority.  The Supreme Court has ruled against defining a right at too high a level of generality and held that doing so fails to provide fair warning to officers that their conduct is unlawful outside an obvious case.

*Ray v. Roane*, 948 F.3d 222, 229 (4th Cir. 2020).  Thus, there must be a significant degree of

specificity in the overlap between the on-point sources that show that a right is clearly

established and the conduct under review.  *Marshall*, 523 F. Supp. 3d at 821.  "If the law did not

put the officer on notice that his conduct would be clearly unlawful . . . qualified immunity is

appropriate."  *Saucier v. Katz*, 533 U.S. 194, 206 (2001).

Defendants argue that qualified immunity shields the Commissioners from liability under

Plaintiff's personal-capacity claims, because "the Amended Complaint fails to establish the

violation of a 'clearly established' right that 'every reasonable' Commissioner would have

understood to be a constitutional violation."  (Mem. at 37 (citing *Garrett v. Clarke*, 74 F.4th 579,

583–84 (4th Cir. 2023)).)  Defendants assert that "the Commissioners were applying a duly

enacted, presumptively constitutional Virginia statute," and that Plaintiff "cannot show that *no*

reasonable Commissioner could conclude that the denial [of Plaintiff's rate application] was

lawful."  Defendants point to the presumption of constitutionality afforded to legislative acts and

the Virginia Supreme Court's unanimous holding that the Commission's Order fails to violate

63

the Takings Clause in support of its argument that "it is not clearly established under these facts that the Commissioners' actions were unconstitutional." (*Id.* at 38 (citing Va. S. Ct. Opinion at 41).)

In opposition, Plaintiff seeks to reframe the right in question, arguing that, as far back as 1923, "the Supreme Court has held that "[r]ates which are not sufficient to yield a reasonable return on the value of the property used . . . are unjust, unreasonable and confiscatory." (Oppo. at 37 (quoting *Bluefield Waterworks & Imp. Co. v. Pub. Serv. Comm'n*, 262 U.S. 679, 690 (1923).) Plaintiff frames the constitutional right at issue as follows: a "state cannot impose rates on a toll road so low that the toll road cannot pay its operating expenses or receive any return on investment." (*Id.*) Seeking to soften the blow of the Supreme Court of Virginia's contrary holding, Plaintiff argues that "[t]o be clearly established, a right need not be one with respect to which all judges on all courts agree." (*Id.* at 37–38 (quoting *Owens v. Balt. City State's Att'ys Office*, 767 F.3d 379, 399 (4th Cir. 2014).)

The Court finds Defendants' argument persuasive and concludes that the Commissioners are entitled to qualified immunity here. While Plaintiff asserts that a utility possesses a clearly established constitutional right to be free from "rates on a toll road so low that the toll road cannot pay its operating expenses or receive any return on investment," (*id.* at 37), the Supreme Court of Virginia disagreed with that precise premise, finding that such considerations were not enshrined in the United States Supreme Court's Takings Clause jurisprudence, and that the Commission's imposition of such rates did not violate that clause. (Va. S. Ct. Opinion at 43.) Nor does Plaintiff explain how the Commissioners' purportedly unconstitutional actions occurred after "fair warning . . . that their conduct is unlawful outside an obvious case," particularly where, as here, the Commissioners acted pursuant to duly enacted state legislation

64

(which enjoys a presumption of constitutionality) and which had not (and still has not) been found to violate the federal Constitution in any way. *Ray*, 948 F.3d at 229. Plaintiff's invocation of *Bluefield* and its reference to a "reasonable return" undercuts its argument, since what constitutes a "reasonable" return is precisely the sort of question that "reasonable jurists" could "disagree on," and for which no precise standard can be "clearly established." *Swanson v. Powers*, 937 F.2d 965, 968 (4th Cir. 1991). Indeed, the only "reasonable jurists" who have weighed in on the issue — the full Virginia Supreme Court — adopted a position contrary to Plaintiff's, finding no such constitutional right to be established, let alone "clearly." Nor has Plaintiff shown overlap between any on-point sources demonstrating a clearly established right and the conduct under review beyond a very general level. *Marshall*, 523 F. Supp. 3d at 821. Plaintiff therefore fails to demonstrate that the Commissioners violated a clearly established constitutional right.

In sum, because the Commissioners could not reasonably have known that adhering to the VHCA would violate a "clearly established" constitutional right — which, by all existing accounts, they did not — qualified immunity shields them from Plaintiff's claims for money damages. The Court will therefore dismiss Plaintiff's remaining claim under Count III.

## IV.    CONCLUSION

For the reasons stated above, the Court will GRANT Defendants' Motion to Dismiss (ECF No. 35) and will DISMISS Plaintiff's Amended Complaint in its entirety.  Counts II, IV, V and VII will be dismissed without prejudice.[24]  Counts I, III, VI and VIII will be dismissed with prejudice.

An appropriate Order will issue.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Dated: June 26, 2026

---

[24]    As the Fourth Circuit recently held, "because sovereign immunity is a threshold, nonmerits issue that does not entail any assumption by the court of substantive law-declaring power . . . a dismissal on that basis, like dismissals for lack of jurisdiction, should normally be without prejudice." *Albert v. Lierman*, 152 F.4th 554, 564 (4th Cir. 2025) (internal quotation marks and citations removed).

66